**ACTION FOR CHILDRENS
TELEVISION, et al.,
Plaintiffs,**

v.

**FEDERAL COMMUNICATION
COMMISSION, Defendant.**

**Civ. A. No. 93–0400 RCL.**

United States District Court,
District of Columbia.

May 18, 1993.

Timothy B. Dyk, Jones, Day, Reavis & Pogue, for plaintiffs.

Sally M. Rider, U.S. Dept. of Justice, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on plaintiffs' motion for a preliminary injunction, and plaintiffs' and defendant's cross-motions for summary judgment. For the reasons stated in this Memorandum Opinion, the court denies plaintiffs' motions for a preliminary injunction and summary judgment and grants defendant's motion for summary judgment.

## I. FACTUAL BACKGROUND.[1]

Plaintiffs are a group of broadcasters and interested listeners/viewers who challenge the procedure under which the Federal Communications Commission ("FCC") regulates indecent broadcasting. Plaintiffs contend that the FCC procedure fails to guarantee prompt judicial review of the forfeiture orders FCC issues against broadcasters it believes have broadcast indecent material. Plaintiffs contend that the First and Fifth

---

1. The parties have agreed to Stipulations of Fact ("SOF"), and the court relies upon these stipulations in its recitation of the facts in this case.

Amendments require prompt review of such forfeiture orders.[2]

The FCC is an independent federal regulatory agency created by Congress to regulate interstate and foreign radio communications pursuant to the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.* The Communications Act gives the FCC the authority to take appropriate action when licensees, also known as broadcasters, broadcast "obscene, indecent, or profane" material in violation of 18 U.S.C. § 1464. *See* 47 U.S.C. §§ 312(a)(6) & 503(b)(1)(D).

Under the Communications Act, the FCC has the authority both to determine whether violations of section 1464 have occurred, *see, e.g.*, 47 U.S.C. 503(b)(1)(D), and to impose sanctions for such violations, ranging from forfeitures to short-term renewal of licenses to revocation of licenses. 47 U.S.C. §§ 312(a)(6), 312(b)(2), 503(b)(1)(D). The FCC also has delayed renewal of broadcast licenses and approval of transfer applications in order to investigate indecency complaints against broadcasters. SOF ¶ 9.

The FCC historically has adjudicated indecency forfeitures only under the procedures described in 47 U.S.C. § 503(b)(4). The Communications Act also authorizes the FCC to adjudicate indecency forfeitures in a hearing before an Administrative Law Judge pursuant to 47 U.S.C. § 503(b)(3), but the FCC has rarely if ever used this route. SOF ¶ 8.

When the FCC receives a complaint from a viewer or listener that a licensee has broadcast an indecent program, the FCC staff members examine the complaint to determine whether the broadcast in question might fall within the parameters of the FCC's indecency enforcement practice. Those parameters include whether the broadcast was presented between the hours of 6:00 a.m. and 8:00 p.m. and whether the broadcast contained indecent material, *i.e.*

material that includes patently offensive descriptions of sexual or excretory activities or organs as measured by contemporary community standards for the broadcast medium. SOF ¶ 9. The FCC uses those parameters because of the considerable case law that has developed around indecent speech and its First Amendment protections. The court addresses this case law below. SOF ¶ 9.

After determining that an indecency complaint fall within these parameters, the FCC staff members in the Complaints and Investigations Branch, Enforcement Division, Mass Media Bureau make a threshold recommendation whether to proceed with an investigation of the complaint. If the Mass Media Bureau, in consultation with the General Counsel's Office and/or the Commissioners' Assistants, decides that the complaint does not warrant investigation, the complaint is dismissed. If, on the other hand, a determination is made to investigate a complaint, FCC staff members will often send a Letter of Inquiry ("LOI") to the broadcaster named in the complaint. Because the complaining party typically does not serve the broadcaster with a copy of the complaint filed with the FCC, in most instances the LOI serves as the broadcaster's first notice that a complaint has been filed. The LOI is a request for additional information about the broadcasts in question and does not represent a final determination of an indecency violation. The staff uses LOIs in order to obtain information and afford licensees an opportunity to respond to allegations of violations prior to the decision on whether a violation occurred. SOF ¶ 10.

After the broadcaster responds to the LOI, the staff members must decide whether a violation has in fact occurred. If the staff members conclude that a violation has occurred, they send the broadcaster a Notice of

---

**2.** Plaintiffs are: Action for Children's Television; the American Civil Liberties Union; the Association of Independent Television Stations, Inc.; Evergreen Media Corporation; EZ Communications, Inc.; Fox Broadcasting Company, Inc.; Fox Television Stations, Inc.; Greater Media, Inc.; Infinity Broadcasting Corporation; the Motion Picture Association of America, Inc.; the National Association of Broadcasters; the National Association of College Broadcasters; National Public Radio; People for the American Way; Post–Newsweek Stations, Inc.; the Public Broadcasting Service; the Radio–Television News Directors Association; Shamrock Broadcasting, Inc.; the Society of Professional Journalists; South Fork Broadcasting Corporation; and 20th Century Fox Film Corporation.

Apparent Liability ("NAL").[3] The NAL acts as a "preliminary notice issued by the Commission, or by Bureaus/Offices under delegated authority, alleging the violation of the Commission's rules and requesting payment from the alleged violator." SOF Exh. 1, FCC Directive 1157.1, at 2. There is no formal evidentiary hearing on an NAL. The broadcaster's only recourse is to either pay the forfeiture or submit, usually within 30 days from the issuance of the NAL, an opposition to the NAL in which it can explain why a forfeiture should not be imposed or should be reduced. *See* 47 U.S.C. § 503(b)(4)(C); 47 C.F.R. § 1.80. In addition, broadcasters or their attorneys often make oral and written presentations to the Commissioners and other FCC staff members in an effort to persuade the FCC not to issue a forfeiture order. The NAL does not represent a final determination of an indecency violation. SOF ¶ 11.

After reviewing a broadcaster's response (if any) to the NAL, the FCC decides whether a forfeiture is appropriate. Where the Commission has issued an NAL, and the broadcaster has not paid, the FCC has never declined to impose liability in its final decision. In making this determination, the FCC is requested to consider a number of factors, including "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." *See* 47 U.S.C. § 503(b)(2)(D); 47 C.F.R. § 1.80(b)(4). In determining whether to increase the amount of a forfeiture because of a pattern of indecent broadcasting, the FCC has twice cited prior alleged indecent broadcasts that are the subject of contested and judicially unreviewed indecency forfeitures. *See, Notice of Apparent Liability to Evergreen Media Corp.*, FCC 93–97, at 4 & n. 5 (Feb. 25, 1993); *Notice of Apparent Liability to Sagittarius Broadcasting Corp.*, 71 Rad.Reg.2d (P & F) 989, 990 & n. 3 (1992). SOF ¶ 26.

After issuance of a forfeiture order by the Commission or the Mass Media Bureau, a broadcaster may petition for reconsideration of the order, seeking reduction or rescission of the forfeiture. If a forfeiture order is issued by the Mass Media Bureau, a broadcaster may file an application for review with the FCC, seeking reversal or modification of the Bureau's decision. The issuance of a forfeiture order by the Commission, or a Mass Media Bureau forfeiture order that the broadcaster has not appealed to the FCC, represents a final agency determination that the broadcaster has violated 18 U.S.C. § 1464. SOF ¶ 12.

Under 47 U.S.C. § 503(b)(6), the FCC may not impose a forfeiture penalty for a violation that occurred (1) more than one year prior to the date of issuance of the NAL or (2) prior to the date of commencement of the last term of license for which the broadcaster has been granted a license by the FCC, whichever is earlier. In addition, the FCC has internal guidelines for tracking and processing NALs. FCC Directive 1157.1, at 4, states that FCC staff members "are required to initiate forfeiture orders expeditiously, generally within 60 days after issuance of NALs...." SOF ¶ 18.

In the FCC's experience, many broadcasters that have been assessed forfeitures for indecency violations have paid those forfeitures, either shortly after the issuance of an NAL or in compliance with a forfeiture order. If a broadcaster does not seek reconsideration or review of a forfeiture order, and fails to pay the forfeiture order within 60 days after issuance of the forfeiture order, and does not indicate in writing its intent not to pay, FCC staff members proceed to send three progressively stronger dunning letters at 30 day intervals in an effort to secure payment of the forfeiture. If a broadcaster still has not paid the forfeiture after receiving three dunning letters, or has indicated in writing its intent not to pay, the FCC refers the matter to the United States Attorney for initiation of a collection action in United States District Court. FCC Directive 1157.1, at 4–5. To date, only two broadcasters have refused to pay forfeitures imposed for indecent broadcasts after the FCC has exhausted its dunning letter procedures. One other

---

**3.** At oral argument, plaintiffs' counsel informed the court that the Commission itself must approve NALs that carry a penalty of greater than $20,000.

broadcaster indicated in writing its intent not to pay after receive one dunning letter. The FCC has asked the United States Attorney to initiate collection actions against all three broadcasters. SOF ¶ 20. Pursuant to 28 U.S.C. § 2462, the United States Attorney must file an action to collect a forfeiture imposed by the FCC within five years from the date when the claim first accrued.

Within this enforcement procedure is the potential for a greatly prolonged forfeiture process, a potential that plaintiffs claim the FCC has amply realized. In the past, the FCC has taken between 6 and 35 months to issue an NAL from the time of the initial complaint, with the average wait being 14 months. After issuing an NAL, the Commission has taken from 6 to 23 months to issue the final forfeiture order, with the average wait for the final order being 11 months.[4] Once a forfeiture order becomes final, a broadcaster could wait another period (but no longer than five years from when the claim accrued) before the United States Attorney files suit to enforce the order and thereby precipitate its judicial review.

There are few if any checks on the duration of a forfeiture proceeding. There is no statute or regulation that (1) imposes time limits on the FCC's processing of indecency complaints; (2) requires expedition in such processing; (3) imposes time limits on the United States Attorney's filing of forfeiture actions; or (4) requires expeditious filing of forfeiture actions. SOF ¶ 23. Once a forfeiture action ultimately is filed in federal court, no statute requires the District Court to decide the action within a specified period of time, and there is no requirement of expedition. SOF ¶ 24. Plaintiffs contend that this scheme renders them powerless to speed the forfeiture order through the process and ensure its prompt judicial review.

Unlike obscenity, indecent speech is fully protected by the First Amendment. *See, e.g., Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93

(1989). Nonetheless, the FCC constitutionally can restrict indecent broadcasting to certain times of the day. In *FCC v. Pacifica Foundation,* 438 U.S. 726, 749–50, 98 S.Ct. 3026, 3040–41, 57 L.Ed.2d 1073 (1978), the Supreme Court found that the government's interest in protecting unsupervised children from indecent broadcasting allowed the FCC to limit indecent broadcasts to those times of day when such an audience would be in low attendance.

Since *Pacifica,* there has been extensive litigation in this Circuit regarding the FCC's definition of both indecency and the "safe harbor" time period during which indecent programs can be broadcast. Of particular importance are two cases that the lead plaintiff in this case, Action for Children's Television ("ACT"), brought to the D.C. Circuit. *See generally* William Banks Wilhelm, Jr., Note, *In the Interest of Children: Action for Children's Television v. FCC—Improperly Delineating the Constitutional Limits of Broadcast Indecency Regulation,* 42 Cath. U.L.Rev. 215 (1992) (discussing *ACT* I–III).

In *Action for Children's Television v. FCC,* 852 F.2d 1332 (D.C.Cir.1988) ("*ACT* I"), the Circuit Court held that the FCC may regulate indecent broadcasting only to the extent necessary to protect unsupervised children, 852 F.2d at 1240, and that the FCC had not adequately justified its decision to restrict indecent broadcasting to between midnight and 6:00 a.m. 852 F.2d at 1340–44. After *ACT* I, Congress passed a law requiring the FCC to completely prohibit indecent broadcasting and eliminate any safe harbor at all. In *Action for Children's Television,* 932 F.2d 1504 (D.C.Cir.1991) ("*ACT* II"), the Court of Appeals invalidated that law and again instructed the FCC to "identify some reasonable period of time during which indecent material may be broadcast." 932 F.2d at 1509. The FCC still has not accomplished this and pursuant to another new federal statute; Pub.L. No. 102–356, 106 Stat. 949, 954 (1992); has limited the safe harbor to between midnight and 6:00 a.m. *See Report*

---

4. Plaintiffs' counsel supplied the court with these figures at oral argument, based on Exhibit 3 to the Stipulations of Fact. Exhibit 3 lists all of the indecency forfeiture proceedings since 1987 that have resulted in the issuance of LOIs and/or

NALs. The chart tracks each proceeding from the date when the apparently indecent material aired to the date of the last activity in the proceeding.

and Order in the Matter of Enforcement Against Broadcast Indecency in 18 U.S.C. § 1464, FCC 93042 (adopted Jan. 19, 1993). Now ACT III is pending in the Court of Appeals. In ACT III, No. 93–1092 (filed Jan. 27, 1993), Action for Children's Television argues among other things that the safe harbor is unconstitutionally narrow. The D.C. Circuit has stayed FCC's enforcement of the midnight to 6:00 a.m. safe harbor pending oral argument, which is set for September 13, 1993. Because of the stay, the FCC has been enforcing an 8:00 p.m. to 6:00 a.m. safe harbor. SOF ¶ 9. None of the issues raised in these cases are before the court now. These cases simply put plaintiffs' claim in a legal context.

Plaintiffs bring two claims, both of which arise out of the pace of the forfeiture process. First, plaintiffs claim that the forfeiture process violates the First and Fifth Amendments because it constitutes a system of censorship without prompt judicial review. Plaintiffs contend that the forfeiture scheme causes self-censorship because of two pre-existing factors present in the FCC regulatory scheme.

The first factor is that the FCC frequently uses forfeiture orders to announce new indecency standards the FCC expects all broadcasters to follow, and threatens them with sanctions should they refuse to comply. See, e.g., Notice of Apparent Liability to Sagittarius Broadcasting Corp., 71 Rad.Reg.2d (P & F) 989 (1992); In re Applications of Cook Inlet Radio License et al. for Assignment, 71 Rad.Reg.2d (P & F) 992 (1992).

The second factor involves the actions of the FCC Commissioners. According to plaintiffs, the FCC Commissioners use the unreviewed NALs as binding standards and make public statements to the effect that all broadcasters must follow these standards or risk adverse FCC action. Plaintiffs present evidence that the FCC Commissioners use their positions as a bully pulpit to condemn broadcasters who are involved in the forfeiture proceedings because of allegedly indecent broadcasts and to urge all other broadcasters to avoid such sanctionable behavior. SOF ¶ 13 & Exh. 2. Through these statements, the Commissioners like to think of themselves as simply providing "guidance" to broadcasters, although they also threaten "adverse FCC action" if broadcasters should refuse to comply. SOF ¶ 14.

Plaintiffs contend that the combination of these two factors causes broadcasters to self-censor because they have no hope of getting prompt judicial review of an indecency forfeiture order. According to plaintiffs, broadcasters would rather censor their own broadcasts than risk the wrath of the FCC and its Commissioners, who have "warned that broadcasters who engage in indecent broadcasting contrary to FCC indecency rulings might be subjected to various sanctions, including forfeiture penalties; denial or delay of applications to renew, acquire or transfer broadcast licenses; short-term renewal of broadcast licenses; or revocation of broadcast licenses." SOF at ¶ 27. Plaintiffs contend broadcasters must self-censor to avoid such prospects when they have no hope of prompt judicial review. This alleged self-censorship and chilling of the broadcasters' First Amendment rights leads plaintiffs to contend that the forfeiture procedure violates the Constitution. Specifically, plaintiffs claim that 47 U.S.C. §§ 503(b)(3) and (4), which outline the forfeiture procedure, are unconstitutional.

Plaintiffs also raise a second, related claim. Plaintiffs' second claim is a statutory claim and not a constitutional one. 47 U.S.C. ¶ 504(c) provides that "[i]n any case where the Commission issues a notice of apparent liability looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final." Plaintiffs contend that the FCC has violated this provision by relying "upon contested and judicially unreviewed indecency forfeiture orders to punish or threaten broadcasters with increased forfeiture penalties, revocation or non-renewal of broadcast licenses, and delayed or denied processing of various assignment or transfer applications." Complaint ¶ 56.

Plaintiffs filed for a preliminary injunction when they filed their Complaint. Plaintiffs and defendant then agreed to file cross-motions for summary judgment and consolidate plaintiffs' application for a preliminary injunction with a hearing on the merits of plaintiffs' complaint.[5] The parties also stipulated to all facts relevant to this dispute in lieu of discovery. The court appreciates the responsible way counsel developed the factual record herein, allowing the court to focus its energies on the difficult legal issues presented. Counsel have also very ably assisted the court with superb legal briefs and oral arguments. Counsel for both sides set an example worth emulation.

The court now will address the parties' cross-motions for summary judgment. Because both motions raise the same issues, the court will consider the two motions simultaneously. The court will not reach plaintiffs' motion for a preliminary injunction because the court's decision on the summary judgment issues renders that motion moot.

## II. DISCUSSION.

As noted above, plaintiffs and defendants have stipulated to the facts relevant to this matter, so no disputes as to the facts exist. Accordingly, the court will grant summary judgment in favor of either party only if either party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Before reaching the merits of plaintiffs' claims, however, the court must address its jurisdiction over this matter as well as plaintiffs' standing to bring this suit. The FCC has raised both of these issues, and the court must resolve them before moving on to the merits.

### A. *Jurisdiction.*

In its motion to dismiss, or, in the alternative for summary judgment, the FCC challenges this court's subject matter jurisdiction over both of plaintiffs' claims. The maze of jurisdictional rules governing the review of

FCC matters is difficult to navigate, but the court concludes that plaintiffs have done so successfully on their constitutional claim.

■ The doctrine of primary jurisdiction requires a party who wishes to challenge an FCC policy or practice to first do so through a motion for a declaratory ruling with the Commission itself. *See FCC v. ITT World Communications, Inc.,* 466 U.S. 463, 468 n. 5, 104 S.Ct. 1936, 1939 n. 5, 80 L.Ed.2d 480 (1984); *Writers Guild of America, West v. American Broadcasting Co.,* 609 F.2d 355, 363–66 (9th Cir.1979), *cert. denied,* 449 U.S. 824, 101 S.Ct. 85, 66 L.Ed.2d 27 (1980). The Communications Act then gives the Courts of Appeals exclusive jurisdiction to review the FCC's declaratory rulings in those cases, as well as all policies, practices, and regulations adopted by the Commission. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *see ITT,* 466 U.S. at 468, 104 S.Ct. at 1939. The Courts of Appeal also have exclusive jurisdiction over any suit seeking relief that might affect the Circuit Courts' future jurisdiction under the Communications Act. *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70, 75–79 (D.C.Cir.1984).

■ These jurisdictional doctrines do limit a District Court's jurisdiction over FCC matters, but a sliver of the jurisdictional pie still remains on the District Court's plate. As already discussed, the District Court has jurisdiction over forfeiture enforcement actions brought by the U.S. Attorney on behalf of the FCC. 47 U.S.C. § 504(a). *See also Dial Information Services Corp. v. Thornburgh,* 938 F.2d 1535, 1540 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 966, 117 L.Ed.2d 132 (1992). More importantly, the District Court retains jurisdiction over facial challenges to the constitutionality of a statute, 28 U.S.C. § 1331, even if that statute relates to an FCC matter.[6]

---

**5.** Defendant filed a motion to dismiss, or, in the alternative, for summary judgment. The FCC did so because it challenges this court's jurisdiction over this matter as well as the plaintiffs' standing to bring these claims.

**6.** *TRAC* did not disturb this court's jurisdiction over facial challenges to statutes governing FCC operations. *Ticor Title Ins. v. FTC,* 814 F.2d 731, 843 (D.C.Cir.1987) (Opinion of Edwards, J.) ("*TRAC* itself did not raise this situation....."); *Time Warner Entertainment Co. v. FCC,* 810 F.Supp. 1302, 1304 (D.D.C.1992).

Plaintiffs' first claim challenges the facial validity of the forfeiture provisions of the Communications Act of 1934. The FCC contends that plaintiffs' claim is really an attack on the FCC's method of enforcing its broadcast indecency policies, a challenge that only the Court of Appeals could hear. The court disagrees with this construction of plaintiffs' first claim.

Plaintiffs go to great lengths to lay a factual context for their challenge to the forfeiture provisions. Plaintiffs explain the FCC's use of NALs to state new indecency standards and the FCC Commissioners' use of public speeches to browbeat broadcasters into submission. These foundational facts do not transform plaintiffs' claim into one challenging these practices. Plaintiffs' claim remains a challenge only to the facial validity of the forfeiture provisions. The background plaintiffs supply regarding these practices only allows the court to determine whether the forfeiture provisions are facially unconstitutional given the universe of circumstances under which broadcasters must operate. *Cf. Sable Communications v. FCC*, 492 U.S. 115, 128–29, 109 S.Ct. 2829, 2837–38, 106 L.Ed.2d 93 (1989) (ban on commercial telephone indecency unconstitutional because no facts in record demonstrated ban was necessary to protect unsupervised children); *Carlin Communications v. FCC*, 749 F.2d 113, 121 (2d Cir.1984) (similar ban unconstitutional because record did not demonstrate why prohibition needed during daytime school hours).

The FCC alternatively argues that plaintiffs' facial challenge rests on the premise that the forfeiture provisions have the effect of creating an informal censorship scheme. The FCC continues that if the forfeiture scheme allows the FCC to censor broadcasters, the FCC does so in violation of 47 U.S.C. § 326, which prohibits the Commission from engaging in censorship. The FCC contends, therefore, that plaintiffs' claim of censorship is a claim that the FCC is acting *ultra vires,* in violation of section 326, and that under the doctrine of primary jurisdiction plaintiffs must first bring this claim to the FCC.

The censorship that section 326 prohibits and the censorship at issue here are quite different. In *FCC v. Pacifica Foundation,* 438 U.S. 726, 737, 98 S.Ct. 3026, 3034, 57 L.Ed.2d 1073 (1978), the Supreme Court held that the "subsequent review of program content is not the sort of censorship at which [section 326] was directed." The Court read section 326 narrowly, to encompass little if anything more than " 'the sort of censorship which went on in the seventeenth century in England.' " *Id.* at 736 n. 9, 98 S.Ct. at 3033 n. 9, *quoting* 2 Z. Chafee, *Government and Mass Communications* 641 (1947). The censorship involved here is self-censorship and not the prior review or censorship prohibited by section 326. Plaintiffs base their claim against the FCC based on First Amendment case law, not section 326, so they need not bring this claim to the FCC first. The court concludes that it has jurisdiction over plaintiffs' first claim.

This court's jurisdiction over plaintiffs' second claim is more problematic. In their statutory claim, plaintiffs contend that the FCC violates section 504(c) of the Communications Act by relying on unadjudicated forfeiture orders to increase penalties in later proceedings against the same broadcasters. The court concludes that it does not have jurisdiction over this claim.

This court only has jurisdiction over an FCC matter if that matter involves the review of a forfeiture order or a challenge to the facial validity of a statute. That is not the case here, and plaintiffs offer no other basis for concluding that this claim falls within this court's sliver of jurisdiction over FCC matters.

This claim attacks an FCC policy or practice and is subject to the doctrine of primary jurisdiction. *See Writers Guild,* 609 F.2d at 363–66. Plaintiffs concede this but argue that the court should not apply the primary jurisdiction doctrine because the purposes of this doctrine would not be met by doing so.

Plaintiffs argue that courts only rely on primary jurisdiction when the expert and specialized knowledge of the agency is necessary to resolve the dispute. Plaintiffs contend that the resolution of their second claim does not require agency expertise and is within the conventional competence of the

**12**

courts.[7] The court disagrees. Whether or not FCC practice violates section 504(c) is an issue that the FCC should "have the first crack at." *Peoria v. General Elec. Cablevision Corp.*, 690 F.2d 116, 121 (7th Cir.1982). The FCC has special expertise in determining whether it has violated the statute that governs its conduct. This court will not initially preempt the FCC's opportunity to demonstrate its expertise when such a specialized issue is involved.

Plaintiffs alternatively contend that this court should retain jurisdiction because any request to the FCC for a declaratory ruling would be futile. They contend that the FCC will be biased on this issue because it raises the question of whether the FCC complies with a statute that restricts its own authority. The case plaintiffs cite for this proposition, *Peoria v. General Elec. Cablevision Corp., supra,* does not state that futility defeats primary jurisdiction. There the Seventh Circuit chastised a party for even attempting to justify on futility grounds its end-run around the FCC and procession straight to court. 690 F.2d at 121. *Peoria* concluded, however, that even if referral of the issue to the FCC would have been futile, the party should have done so anyway because the FCC's "response could [have been] of great assistance to the court" that ultimately might review the FCC ruling at issue. *Id.* at 122.

Because plaintiffs' second claim is of such importance to the FCC, as the futility argument itself demonstrates, this court finds that the FCC alone has jurisdiction over this claim at this time. The FCC should review this issue before the judicial branch becomes involved. Once the FCC has done so, the Court of Appeals will be able to fully understand the FCC's reasoning and determine the validity of plaintiffs' claim. Accordingly, the court grants the FCC's motion to dismiss plaintiffs' second claim and count III of plaintiffs' complaint.

*B. Case and Controversy.*

The FCC next attacks the ability of these plaintiffs to bring their remaining constitutional claim. The FCC makes this argument in two ways. First the FCC challenges the standing of all but three plaintiffs. Then the FCC contends that the three remaining plaintiffs cannot bring the constitutional claim to this court either because that claim is not ripe or because interests of comity prevent this court from reviewing it. The court will address each of the FCC's arguments in turn.

**1. STANDING.**

■ The FCC first challenges the standing of the non-broadcasting, viewer/listener plaintiffs. The FCC contends that three of the plaintiffs, Action for Children's Television (ACT), the American Civil Liberties Union (ACLU), and People for the American Way, lack standing because they represent the interest of listeners and viewers, *i.e.,* the public, as opposed to broadcasters. The FCC relies on *Illinois Citizens Committee for Broadcasting v. FCC,* 515 F.2d 397 (D.C.Cir. 1975) for this position. The court finds *Illinois Citizens* dispositive and concludes the listener and viewer plaintiffs lack standing to bring the constitutional claim.

In *Illinois Citizens,* the Illinois Citizens Committee for Broadcast challenged the FCC issuance of a particular indecency forfeiture order as well as the procedure the FCC used to issue that order. The D.C. Circuit concluded that the Committee had standing to challenge the merits of the forfeiture order but not the procedure used to arrive at that order. 515 F.2d at 402–03. The court specifically determined that the forfeiture procedures could not be "asserted by the *public* as procedural error." *Id.* at 403.

Plaintiffs respond by relying on the general rhetoric of the Supreme Court regarding

7. For this position, plaintiffs rely on *Nader v. Allegheny Airlines,* 426 U.S. 290, 305, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976). In that case, Ralph Nader sued Allegheny Airlines for misrepresentation when he was "bumped" from a flight for which he had a ticket. The Supreme Court concluded that the misrepresentation claim did not have to be brought first to the FAA under the doctrine of primary jurisdiction because the resolution of that claim did not require agency expertise and was within the conventional competence of the courts. A misrepresentation claim is quite different from a claim that an agency is violating its own enabling statute.

the public's interest in First Amendment broadcasting issues. Plaintiffs state that in cases like *Metro Broadcasting v. FCC*, 497 U.S. 547, 567, 110 S.Ct. 2997, 3010, 111 L.Ed.2d 445 (1990), and *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969), the Supreme Court has recognized those interests and that those interests give them standing. Those cases, however, discussed the interests of viewers and listeners to justify the regulation of broadcasters, not challenges to those regulations. Those cases do not support plaintiffs' position that any citizen can challenge any FCC regulation simply because of the public's interest in broadcast concerns. Even if plaintiffs' position is correct, this court respectfully concludes that it must follow the more specific precedent on the subject. That precedent is *Illinois Citizens* and that case requires the conclusion that ACT, the ACLU, and People for the American Way lack standing to bring a constitutional challenge to the FCC forfeiture procedure. Accordingly, the court grants the FCC's motion to dismiss these plaintiffs from the case.

■ The FCC's second standing challenge centers on the broadcasting plaintiffs that have not been involved in a forfeiture proceeding.[8] The FCC contends that these plaintiffs do not have standing because they have suffered no injury from the forfeiture procedures under challenge. The plaintiffs counter that while they have never been the subject of a forfeiture order, the forfeiture orders imposed on other broadcasters have chilled these plaintiffs' exercise of their First Amendment rights. Plaintiffs contend that the chill they have suffered creates a sufficient injury to support their standing to bring this action. As long as plaintiffs prove they have been chilled, plaintiffs continue, they may remain in the case. The court disagrees and concludes that these plaintiffs have no standing and must be dismissed.

To have standing to bring a claim, a party "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The D.C. Circuit has concluded that the chilling effect of certain laws on a parties' First Amendment freedoms does not meet this standard. In *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1378 (D.C.Cir.1984), the Circuit stated that " '[a]llegations of a subjective "chill" are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm,' " *quoting Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–2326, 33 L.Ed.2d 154 (1972). The chilling effect of a law supplies only the reason why that law is invalid and not the harm which entitles the plaintiff to challenge it. *United Presbyterian*, 738 F.2d at 1378. Even if plaintiffs did prove that they had been chilled by this statute then, they would not have standing under the case law of this circuit.

Plaintiffs contend that they still could have standing if they feared the imminent imposition of a forfeiture order. Plaintiffs rely on *Steffel v. Thompson*, 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974) for this position. In that case, the police had warned the individual in question twice to stop his handbilling and had told him that if he tried again he would be prosecuted. Because there was such a clear possibility of prosecution, the Supreme Court held in that *"in these circumstances"* the handbiller had standing even though he had not been prosecuted. *Id.*

Those circumstances do not exist here. These plaintiffs have not been threatened with forfeiture proceedings. Plaintiffs contend that they have conformed their conduct out of fear of forfeiture orders, SOF ¶ 30, but that assertion is unsubstantiated by the record and wholly speculative. The future harm

---

**8.** These plaintiffs are: Association of Independent Television Stations, Inc.; EZ Communications, Inc.; Fox Broadcasting Company, Inc.; Fox Television Stations, Inc.; the Motion Picture Association of America, Inc.; the National Association of Broadcasters; the National Association of College Broadcasters; National Public Radio; Post–Newsweek Stations; Public Broadcasting Service; the Radio–Television News Directors Association; Shamrock Broadcasting, Inc.; the Society of Professional Journalists; South Fork Broadcasting Corporation; and 20th Century Fox Film Corporation.

**14**

posed to plaintiffs by the forfeiture procedures is too "conjectural [and] hypothetical," and not "distinct and palpable, concrete, direct, ... real and immediate" enough to give these plaintiffs standing. *See United Presbyterian,* 738 F.2d at 1378.

Plaintiffs also rely on *Clements v. Fashing,* 457 U.S. 957, 962, 102 S.Ct. 2836, 2843, 73 L.Ed.2d 508 (1982) for this position. There again the Supreme Court found standing because of the specific circumstances of the case. The original plaintiffs were public officials who could not run for another office because once they declared their candidacy, a state statute provided for those officials' *automatic* resignation from their current position. The Court found standing for two reasons. First, the Court found that the plaintiffs' claims that they would run for office but for the statute were *uncontested.* Second, the Court found that the statute in question provided for the *automatic* resignation of the plaintiffs, by operation of law, once they declared their candidacy. For these two reasons, the Court found the feared injury was not speculative. Here, the FCC does contest plaintiffs' allegations that they conform their conduct to avoid indecency forfeitures, and the court agrees that those allegations are speculative. Here also the initiation of forfeiture proceedings would not be automatic should these plaintiffs violate the indecency regulations. The FCC would have to receive a complaint and the program would have to be reviewed by the FCC staff first. Those safeguards and the contested nature of the plaintiffs' claims distinguish this case from *Clements.* The court grants the FCC's motion to dismiss these plaintiffs for lack of standing.

## 2. RIPENESS AND COMITY.

■ The FCC's last challenge is directed at the remaining three plaintiffs: Infinity Broadcasting Corporation; Greater Media, Inc.; and Evergreen Media Corporation. The FCC contends that the constitutional claim is not ripe for Infinity and Greater Media, and that in the interests of judicial comity the court should not review the claim as brought by Evergreen. The court concludes that Infinity Broadcasting has standing but that Greater Media does not and that comity prevents its review of Evergreen Media's claim.

The FCC concedes that Infinity and Greater Media have standing. They both are involved in current forfeiture proceedings, and that involvement creates a present injury for standing purposes. FCC's contention is that Infinity and Greater Media's constitutional claim is not ripe until those forfeiture proceedings become final. Because Infinity and Greater Media's claim centers on the delays involved in the imposition of forfeiture orders, the FCC contends that the two broadcasters cannot bring that claim until two events occur: (1) the FCC imposes a forfeiture at the end of the proceedings now underway, and (2) Infinity and Greater Media suffer injury because of the length of the forfeiture proceeding and any subsequent enforcement actions. Infinity and Greater Media counter that they are making a facial challenge to the forfeiture statute, and that such a claim is ripe before the FCC completes the forfeiture proceedings.

In determining whether an issue is ripe for judicial review, this court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Plaintiffs' facial challenge does not necessarily satisfy these two factors. Under *Media Access Project v. FCC,* 883 F.2d 1063, 1070 (D.C.Cir.1989), because the FCC has discretion in its application of the forfeiture procedure, plaintiffs' purely facial challenge still may not be ripe for review if the FCC could either decide not to impose a forfeiture or do so expeditiously.

In *Media Access Project,* a group of nonprofit organizations challenged an FCC regulation that governed the waiver of fees for FOIA requests. 883 F.2d at 1064. The nonprofit organizations challenged the facial validity of the regulation by arguing that it was arbitrary and capricious. *Id.* at 1070. The Circuit Court concluded that the challenge was not ripe because it was not clear that the FCC would apply the statute to the detriment of those organizations. Of particular importance in that case was the FCC's repre-

sentation that the statute would not be so applied. *Id.* The Circuit Court postponed its consideration of the issue until such a detrimental application made the issue ripe for review.

The reasoning of *Media Access Project* controls five out of the six forfeiture proceedings underway between these two plaintiffs. The FCC has instituted three indecency forfeiture proceedings against Greater Media, all for the same radio station, KLSX–FM. In two, the FCC has issued an LOI and Greater Media has responded. In the third, the FCC has issued an NAL and Greater Media has responded. The FCC has initiated all three procedures since July of 1992 and none of them are final yet. SOF Exh. 3.

Two of Infinity's three forfeiture proceedings also are far from final resolution. In one the FCC issued an NAL in December of 1992 and Infinity responded in February of this year. In the second, the FCC issued an LOI in August of 1992 and Infinity responded in October. No further action has been taken in either of these proceedings. SOF Exh. 3.[9]

None of these five proceedings create a ripe claim for these two plaintiffs. "In light of the Commission's discretion in the application of its [indecency and forfeiture] regulations ... [the court concludes] the Commission should at least be given the first opportunity to apply its regulations to [plaintiffs]." *Media Access Project,* 883 F.2d at 1070. "[P]ostponing review would provide for a more efficient examination and disposition of the issues." *State Farm Mutual Insurance Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir. 1986).[10]

This is not true, however, for Infinity's last forfeiture proceeding still in progress. In that proceeding, the FCC issued an NAL on November 29, 1990 and issued a forfeiture order on October 23, 1992. Since that time, Infinity has filed a motion for reconsidera-tion, which is still pending. Unlike *Media Access Project,* the FCC at least initially has signaled its willingness to apply its forfeiture regulations to the detriment of Infinity. The FCC already has imposed a final forfeiture order, and while Infinity has moved for reconsideration of that order, the court finds that the FCC's initial action significant enough to make Infinity's constitutional claim ripe for review.

Infinity has waited two years for this forfeiture proceeding to conclude and, at least so far, the FCC has chosen to impose an indecency forfeiture. There is no need for further factual development. Infinity's claim that the FCC's forfeiture procedure fails to ensure prompt judicial review is ripe, now that a forfeiture has been imposed and Infinity has waited over two years for a court date. The court concludes that only Infinity's constitutional claim is ripe and dismisses plaintiff Greater Media.

The FCC's last challenge is to Evergreen's ability to bring its constitutional claim in this court. The FCC does not challenge Evergreen's standing. The FCC instead contends that this court should not allow Evergreen to continue as a plaintiff because of its involvement in a similar case in another jurisdiction.

■■ Evergreen currently is a party to a forfeiture action in the District Court for the Northern District of Illinois. *United States v. Evergreen Media Corp.,* No. 92–CV–05600 (N.D.Ill. filed Aug. 19, 1992); SOF ¶ 21. Evergreen's challenge to the indecency forfeiture at issue in that case is closely related to the constitutional claim at issue here and could be raised in that litigation. 47 U.S.C. § 504(a); SOF ¶ 25. Considerations of comity preclude this court from resolving that claim when the same claimant could raise it simultaneously in front of another court of equal authority. *Washington Met. Area Transit Auth. v. Ragonese,* 617 F.2d 828, 830 (D.C.Cir.1980). This is especially true here

9. Evergreen also is involved in two forfeiture proceedings that are not yet concluded. The constitutional claim is not ripe as to Evergreen based on these two proceedings for the same reasons it is not ripe as to Greater Media and Infinity.

10. The court also finds no undue hardship in postponing review. These cases have been pending less than a year, and the mere potential for injury from delay or forfeiture imposition is insufficient to render an issue ripe for review. *Alascom, Inc. v. FCC,* 727 F.2d 1212, 1217 (D.C.Cir.1984).

because the Illinois matter was filed before this one and should be allowed to proceed to its conclusion first. *Id.* The court concludes that considerations of comity preclude it from allowing Evergreen to continue as a plaintiff. The court grants the FCC's motion to dismiss Evergreen as a plaintiff.

### C. *The Merits.*

■ The remaining plaintiff, Infinity Broadcasting Corporation, challenges the constitutionality of 47 U.S.C. § 503(b)(4).[11] As already discussed, section 503(b)(4) provides the procedure the FCC uses to impose indecency forfeitures on broadcasters. Infinity contends that that provision is facially invalid because it creates a system of prior restraint and censorship without providing for prompt judicial review of those censorship decisions.

Infinity faces a "heavy burden" in seeking to have section 503(b)(4) declared unconstitutional. *Rust v. Sullivan,* — U.S. —, —, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991). This is even more true here because Infinity is challenging the facial validity of this provision.

A facial challenge to a legislative act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exist under which the Act would be invalid.

The fact that the [ ] Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render the Act wholly invalid....

*United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). The court concludes that Infinity has not met this high standard.[12]

Infinity bases its First Amendment claim almost exclusively on the Supreme Court case of *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). *Bantam Books* was set in Rhode Island and involved a clash between the Rhode Island Commission to Encourage Morality in Youth and some local book merchants. The Rhode Island Legislature created the Commission and gave it the duty to investigate and recommend the prosecution of any purveyor of obscene publications.[13] 372 U.S. at 59–60, 83 S.Ct. at 633–634. In practice, the Commission would send a letter to the targeted merchant notifying it that certain designated books or magazines had been declared objectionable for sale, distribution, or display to youths under 18 years of age. *Id.* at 61, 83 S.Ct. at 634. Those notices also would thank the business in advance for its cooperation, remind it that the Commission had a duty to recommend to the Attorney General those cases in need of prosecution, and inform the business that the list of objectionable publica-

---

**11.** Plaintiff also challenges section 503(b)(3), but as already mentioned, the FCC rarely if ever has used the 503(b)(3) procedure to adjudicate forfeitures. The court does not address the appropriateness of plaintiffs attack on section 503(b)(3) because the court denies plaintiff's motion for summary judgment and grants that of the FCC.

**12.** The court initially reaches this conclusion initially because plaintiff has not demonstrated that there are no circumstances under which sections 503(b)(3) and (4) could function constitutionally. Sections 503(b)(3) and (4) provide the procedure for the imposition of all FCC forfeitures, not just those relating to indecent broadcasts. 47 U.S.C. § 503(b)(1) states that

Any person who is determined by the Commission, in accordance with [sections 503(b)(3) and (4)], to have—
  (A) willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;

  (B) willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, order issued by the Commission under this chapter or under any treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;
  (C) violated any provision of section 317(c) or 509(a) of this title; or
  (D) violated any provision of section 1304, 1343, or 1464 of Title 18;
  shall be liable to the United States for a forfeiture penalty.
Plaintiff's arguments, even if valid, only go to the imposition of forfeitures regarding indecent broadcasts. While neither the FCC nor plaintiff addressed this argument, the court concludes that the broad applicability of the forfeiture provisions would independently defeat Infinity's facial challenge.

**13.** The enabling statute also gave the Commission the power to outlaw indecent publications, but the Supreme Court in its opinion focused only on the obscenity clause.

tions had been sent to all local police departments. *Id.* at 63, 83 S.Ct. at 635. A police offer would usually visit the business a short time after its receipt of the notice to learn of any action taken. The merchant that brought the action provided evidence to the court that it once it received such a notice it would recall any publications listed and comply with the notice " 'rather than face the possibility of some sort of a court action.' " *Id.* The lower court found as fact that the Commission's actions were " 'clearly to intimidate' " the wholesalers, booksellers, and distributors, and that the Commission's activities " 'resulted in the suppression of the sale and circulation of the book listed in said notices.' " *Id.,* at 63–64, 83 S.Ct. at 635–636.

The Supreme Court held that the Commission's enabling statute was facially invalid and unconstitutional as violative of the First Amendment. The Court emphasized that the regulation of obscene publications requires "the most rigorous procedural safeguards" *id.* at 66, 83 S.Ct. at 637, but found that such safeguards were not present to keep the Commission at bay. The Court recognized that the Commission did not have the power to actually seize any books, but found a First Amendment violation anyway because the Commission's coercive powers had achieved the same result through more informal channels. *Id.* at 68–69, 83 S.Ct. at 638–639. Without any procedural safeguards to protect the plaintiffs from the Commission's coercion, the Supreme Court concluded that the Rhode Island scheme was a de facto system of prior restraint and informal censorship that violated the First Amendment. *Id.* at 70–71, 83 S.Ct. at 639–640.

Infinity tries to build its First Amendment claim by drawing comparisons between the FCC forfeiture scheme and that held unconstitutional in *Bantam Books.* Infinity contends that the FCC too is guilty of using a statutory scheme to censor. Infinity argues that a system of prior restraint now exists for broadcasters through the FCC's use of NALs to create new indecency standards and subsequent penalization of broadcasters who fail to comply with those standards. The FCC censors through intimidation, Infinity contends, and the broadcasters have no choice but to accede if they wish to retain their licenses and livelihood. Infinity believes that the FCC's use of NALs to set standards and deter future programming is unconstitutional because the forfeiture scheme does not provide for prompt review of those NALs. Infinity reasons that just as *Bantam Books* turned on the dearth of procedural safeguards protecting the Rhode Island merchants, so does this case turn on the lack of procedural safeguards protecting broadcasters. The court recognizes that there are some similarities between this matter and *Bantam Books,* but the court finds the distinctions between the two more compelling.

The first and most significant distinction is that between the mediums of expression at issue in these two cases. In *Bantam Books,* the Rhode Island Commission was regulating publications, a medium of expression that historically has suffered from few restrictions. That is not the case with the broadcast medium, which is at issue in this case.

The Supreme Court has "long recognized that each medium of expression presents special First Amendment problems ... And of all forms of communication, it is broadcasting that has received the most limited First Amendment protection." *Pacifica,* 438 U.S. at 748, 98 S.Ct. at 3039–3040 (citation omitted). Broadcasts receive limited First Amendment protection as compared to publications, for example, because broadcast frequencies are a limited public resource. The scarcity of that resource requires that the government ensure its use is in the public interest. *See Pacifica,* 438 U.S. at 731 n. 2, 98 S.Ct. at 3031 n. 2. The government does so through regulation.

The need for broadcast regulation becomes particularly acute when the broadcast involved includes indecent speech. There are two reasons for this. The first is that the broadcast medium has a "uniquely pervasive" presence in the American home. *Id.* at 748, 98 S.Ct. at 3040. The FCC has the power to heavily regulate indecent broadcasts to ensure that those who wish to avoid indecent broadcasts may do so without having to leave their home or turn off the television and radio. The second reason is that broadcast-

ing is "uniquely accessible to children, even those too young to read." *Id.* at 749, 98 S.Ct. at 3040. The government's established interest in the "well-being of its children," *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968), coupled with the ease of access that children have to broadcasts amply justify the FCC's regulation of this otherwise protected speech. *Id.* 438 U.S. at 749–50, 98 S.Ct. at 3040–41. Based on this last factor, the *Pacifica* Court itself contrasted the government's limited power to regulate indecent publications, as in *Bantam Books,* with its extensive power to regulate indecent broadcasts. *Id.* at 749, 98 S.Ct. at 3040.

Infinity does not address this issue. Infinity apparently assumes that broadcasts enjoy complete First Amendment protection with all its appointments. Contrary to plaintiff's assumption, there is no identity of First Amendment protection across mediums of expression, especially when the medium involved is one that the Supreme Court places at the bottom of the protection spectrum. Plaintiff's argument for the wholesale application of the *Bantam Books* reasoning overlooks this distinction. This court will not extend the *Bantam Books* ruling to a medium of expression that is so much more limited in the First Amendment protection it receives.

The second distinction consists in the differences between the scheme at issue in *Bantam Books* and that at issue here. The Supreme Court labeled the Rhode Island system one of prior restraint for four independent and particular reasons. *See id.* 372 U.S. at 71, 83 S.Ct. at 639. None of those reasons are present here, and the court will not apply *Bantam Books* to this matter in their absence.

First, the scheme in *Bantam Books* had no provision for judicial review of the Commission's decisions. *Id.* at 71, 83 S.Ct. at 639. Judicial review could have occurred only if the Commission recommended a merchant for criminal prosecution and if charges were then filed. Plaintiff contends that the same is true here: judicial review can occur only if the FCC refers a forfeiture order to the Department of Justice which then has to

initiate an enforcement procedure. The difference is that in *Bantam Books,* Rhode Island never initiated any criminal prosecutions and did not seem to intend to. In *Bantam Books* there was a very real possibility that a court would never get a chance to review the Commission's orders. Here, there is already one enforcement proceeding before a district court, *United States v. Evergreen Media Corp.,* No. 92–cv–05600 (N.D.Ill. filed Aug. 19, 1992); SOF ¶ 21, two more cases have been referred to the Department of Justice for prosecution, SOF ¶ 20, and there is no evidence in the record that the FCC is trying to avoid judicial review of its indecency forfeiture orders.

The second factor contributing to the *Bantam Books* holding was that scheme's failure to provide the merchant with notice that its publications would be listed as objectionable. 372 U.S. at 71, 83 S.Ct. at 639. That same failure does not afflict the FCC forfeiture scheme. The FCC routinely sends the targeted broadcaster both an LOI and an NAL, and after its receipt of each the broadcaster has an opportunity to represent its position to the FCC. SOF ¶¶ 10–11. The broadcaster and its attorneys also frequently make supplemental written and oral presentations to the Commissioners and other FCC staff members in an effort to persuade the FCC not to issue a forfeiture order. SOF ¶ 11.

The third factor leading to the *Bantam Books* holding was the Rhode Island Commission's failure to explain its categorization of books as obscene or objectionable. 372 U.S. at 71, 83 S.Ct. at 639. This scheme does not share that failing either. Here, the D.C. Circuit already has upheld the FCC's definition of indecent broadcasting, *see supra* p. 6, against overbreadth and vagueness challenges. *ACT* I, 852 F.2d at 1335–40; *ACT* II, 932 F.2d at 1508. The same could not be said of Rhode Island's definition of obscenity. *Bantam Books,* 372 U.S. at 64, 83 S.Ct. at 636. Here, the FCC also must explain why the subject broadcast was indecent before issuing a forfeiture order. 47 U.S.C. § 503(b)(4). No such requirement existed in Rhode Island.

The final factor weighing in against the Rhode Island scheme was that scheme's suc-

cess at complete suppression of the targeted publications. In *Bantam Books,* the Commission's actions resulted in the complete suppression of the targeted publications. *Bantam Books,* 372 U.S. at 63, 64, 67–68, 71, 83 S.Ct. at 635, 636, 637–638, 639. Unlike the Rhode Island scheme, the FCC's supposed system of informal censorship does not completely ban indecent broadcasts. By its own terms, this scheme allows the broadcast of indecent speech during particular times of the day. As already discussed, the FCC only bans the broadcast of indecent material outside of the "safe harbor" period. Licensees are free to broadcast indecent material at any time between 8:00 p.m. and 6:00 a.m. SOF ¶ 9. Before the FCC even begins investigating an indecency complaint, its staff first determines whether the broadcast aired outside of that safe harbor. SOF ¶ 9. Any "chill" the plaintiff may feel from forfeiture scheme disappears with the daylight.

Infinity is free from the risk of forfeiture as long as it broadcasts its indecent material during the safe harbor of the evening and early morning hours. The merchants in Rhode Island had no similar respite. This court will not construe the FCC forfeiture scheme as a system of censorship when that system only operates for two-thirds of the broadcasting day.

These distinctions demonstrate that the schemes at issue in *Bantam Books* and this case are not the same.[14] The court cannot, based on *Bantam Books,* construe the FCC's forfeiture scheme as one of prior restraint and censorship. The FCC is enforcing a court-approved definition of indecency through a system that provides for notice and judicial review. This is not the prior review and censorship of broadcast material. This is the FCC's regulation of an industry that serves at the pleasure of the public interest. Plaintiff may feel a chill because of the FCC's forfeiture scheme, but that chill is temporal only and has not been unconstitu-

tionally inflicted. Accordingly, the court grants the FCC's motion for summary judgment on Infinity's constitutional claim and denies Infinity's motion for summary judgment.[15]

## III. CONCLUSION.

For the reasons stated in this Memorandum Opinion, the court concludes that it has jurisdiction only over the constitutional claim asserted, that only Infinity Broadcasting Corporation has standing to bring that claim, that the constitutional claim is ripe only as to Infinity, and that the FCC's forfeiture scheme does not violate the First Amendment. An appropriate Order shall issue this date.

### ORDER AND JUDGMENT

This case comes before the court on plaintiffs' motion for a preliminary injunction, and plaintiffs' and defendant's cross-motions for summary judgment. For the reasons stated in the accompanying Memorandum Opinion issued this date it is hereby ORDERED that:

1. The court GRANTS the FCC's motion to dismiss count III of plaintiffs' Complaint for lack of subject matter jurisdiction.

2. The court GRANTS the FCC's motion to dismiss the following plaintiffs for lack of standing: Action for Children's Television; the American Civil Liberties Union; the Association of Independent Television Stations, Inc.; EZ Communications, Inc.; Fox Broadcasting Company, Inc.; Fox Television Stations, Inc.; the Motion Picture Association of America, Inc.; the National Association of Broadcasters; the National Association of College Broadcasters; National Public Radio; People for the American Way; Post–Newsweek Stations, Inc.; the Public Broadcasting Service; the Radio–Television News Directors Association; Shamrock Broadcasting, Inc.; the Society of Professional Journal-

---

14. The court recognizes that *Illinois Citizens Committee for Broadcasting v. FCC,* 515 F.2d 397 (D.C.Cir.1975) questioned whether the FCC forfeiture scheme could be unconstitutional under *Bantam Books.* 515 F.2d at 403. That question was raised in dicta however, and did not address the distinctions this court has drawn.

15. Because the court concludes that the FCC forfeiture scheme does not constitute a system of prior restraint and censorship this court need not address plaintiffs' due process argument.

**20**

ists; South Fork Broadcasting Corporation; and 20th Century Fox Film Corporation.

3. The court GRANTS the FCC's motion to dismiss plaintiff Greater Media, Inc. because Greater Media's claim is not yet ripe.

4. The court GRANTS the FCC's motion to dismiss plaintiff Evergreen Media Corporation based on considerations of comity.

5. The court DENIES the FCC's motion to dismiss plaintiff Infinity Broadcasting Corporation's constitutional claim arising from the 1990 Notice of Apparent Liability.

6. The court GRANTS the FCC's motion for summary judgment on counts I and II of plaintiff's complaint and ENTERS summary judgment for the FCC on those counts, which are hereby DISMISSED WITH PREJUDICE.

7. The court DENIES plaintiffs' motion for summary judgment in its entirety and DENIES plaintiffs' motion for a preliminary injunction as moot. This case now stands DISMISSED.

SO ORDERED.