ACTION FOR CHILDREN'S TELEVI-
SION; American Civil Liberties Union;
the Association of Independent Televi-
sion Stations, Inc.; Evergreen Media
Corporation; EZ Communications, Inc.;
Fox Broadcasting Company, Inc.; Fox
Television Stations, Inc.; Greater Media,
Inc.; Infinity Broadcasting Corporation;
Motion Picture Association of America,
Inc.; National Association of Broadcast-
ers; National Association of College
Broadcasters; National Public Radio;
People for the American Way; Post–
Newsweek Stations, Inc.; Public Broad-
casting Service; Radio–Television News
Directors Association; Shamrock
Broadcasting, Inc.; Society of Profes-
sional Journalists; South Fork Broad-
casting Corporation; Twentieth Centu-
ry–Fox Film Corporation, Appellants,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee.

No. 93–5178.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 30, 1994.

Decided July 18, 1995.

Timothy B. Dyk, Washington, DC, argued the cause and filed the briefs for appellants.

Sally M. Rider, Asst. U.S. Atty., Washington, DC, argued the cause for appellee.

With her on the brief were Eric H. Holder, Jr., U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, DC.

Before EDWARDS, Chief Judge, GINSBURG, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring with reservations filed by Chief Judge HARRY T. EDWARDS.

Dissenting opinion filed by Circuit Judge TATEL.

GINSBURG, Circuit Judge:

Various broadcasters and public-interest groups representing listeners and viewers appeal a judgment of the district court dismissing their constitutional and statutory challenges to the Federal Communication Commission's scheme for imposing forfeitures for the broadcast of indecent material. The appellants' central argument is that the procedures for enforcement set out in 47 U.S.C. §§ 503(b) and 504(c) lack appropriate safeguards—including prompt judicial review—which forces broadcasters to conform with potentially unconstitutional restrictions upon their speech. We hold that the provisions at issue are capable of constitutional implementation and therefore reject the appellants' facial challenge to the statutes. Though we agree that the FCC's implementation of its enforcement scheme is potentially troubling in some respects, we also conclude that the appellants have not alleged facts sufficient to show that the FCC is currently applying the statutes in an unconstitutional manner. We therefore affirm the judgment of the district court.

## I. Background

Section 1464 of 18 U.S.C. provides: "Whoever utters any obscene, indecent, or profane language by means of radio communication shall be fined not more than $10,000 or imprisoned not more than two years, or both." In addition, the FCC may impose a civil forfeiture for each violation of the same statute. 47 U.S.C. § 503(b)(1)(D); *see id.*

§ 503(b)(2)(A) (maximum forfeiture penalty of $25,000 for each violation but not in excess of $250,000 for any continuing violation). The Commission's imposition of a penalty for the broadcast of indecent material—defined by the Commission as "patently offensive descriptions of sexual or excretory activities or organs as measured by contemporary community standards for the broadcast medium"—is not inconsistent with the first amendment. · *See FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (in which the Court also held that the FCC's ruling speech indecent does not violate 47 U.S.C. § 326, which prohibits censorship by the agency).

▮ There are limits, however, to the FCC's authority to proscribe indecent speech. Unlike obscenity, indecent speech is protected under the first amendment; it may be regulated only by the least restrictive means necessary to promote a compelling state interest. *Sable Communications of California, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989). While other cases have examined the substantive limits of the Government's ability to regulate broadcast indecency, *see Pacifica; Action for Children's Television v. FCC,* 58 F.3d 654, (D.C.Cir.1995) (en banc), the questions we address today concern only the procedures by which it does so.

A. The Enforcement Scheme

Section 503(b) of the Communications Act of 1934 authorizes the Commission to impose a forfeiture for the violation of a Commission order or regulation. While these provisions govern all types of forfeitures, the appellants challenge them only insofar as they are used to impose forfeitures arising from the broadcast of allegedly indecent material.

The Commission may take either of two routes to impose a forfeiture. First, the Commission may proceed against a broadcaster under 47 U.S.C. § 503(b)(3), which authorizes the Commission to determine the penalty after a hearing, subject to review in the court of appeals. 47 U.S.C. §§ 402(a), 503(b)(3)(A). If, once the forfeiture determination becomes final, the penalty is not paid, then the Commission may refer the matter to the Attorney General for collection in the appropriate district court. 47 U.S.C. § 503(b)(3)(B). In such a collection action, "the validity and appropriateness of the final order imposing the forfeiture penalty shall not be subject to review." *Id.* While the Commission has stipulated that it generally does not use the procedures of § 503(b)(3) in imposing forfeitures for broadcast indecency, it reserves the authority to do so whenever that would "better serve the ends of justice." 47 C.F.R. § 1.80(g). Although the appellants claim that these procedures "ensure neither prompt administrative adjudication nor prompt completion of judicial review," they do not seriously challenge their constitutionality. In any event, because the Commission does not use § 503(b)(3), we express no view upon the subject.

The alternative, and in practice the exclusive, means of imposing a forfeiture for the broadcast of indecent material is for the Commission to issue a "notice of apparent liability" to the broadcaster, setting forth the relevant facts and granting the potentially liable party "an opportunity to show, in writing, ... why no such forfeiture penalty should be imposed." 47 U.S.C. § 503(b)(4). The Commission initiates the forfeiture process only after receiving a complaint from a listener or viewer. The agency staff reviews each complaint to determine whether it suggests that there has been a violation of the ban on indecent broadcasting. In the course of this review, the staff may send the broadcaster a Letter of Inquiry seeking more information or inviting the broadcaster to respond to the complaint. After further consideration, the Commission decides whether to issue a Notice of Apparent Liability (NAL). The stipulated facts in this case concerning the indecency cases pending when the complaint was filed in district court show that the Commission issues a NAL anywhere from six months to three years after the broadcast to which it relates. During that time, the broadcaster may or may not be aware that the agency is considering whether the broadcast at issue contained indecent material.

The NAL is both sent to the broadcaster and published in the FCC Record. The

NAL advises the broadcaster of its "apparent liability for a forfeiture" in a stated amount for an "apparent violation of 18 U.S.C. § 1464," and gives the broadcaster 30 days to pay or otherwise to respond. *See, e.g., Letter to Mr. Mel Karmazin, President, Sagittarius Broadcasting Corporation,* 5 F.C.C. Rcd 7291 (December 7, 1990). Once the broadcaster has responded or the 30 days have run, the Commission decides whether to order the forfeiture. As far as we can discern from the current record, the FCC has never failed to impose a forfeiture after issuing a NAL.

The Commission's internal guidelines exhort the responsible officials "to initiate forfeiture orders expeditiously, generally within 60 days after issuance of [the NAL]." In the seven instances in which the Commission imposed a forfeiture between January 1987 and March 1993, it took from two to 23 months—and an average of approximately nine months—for the FCC to make its decision.

Generally the forfeiture order recapitulates the history of the case, addresses any arguments raised by the broadcaster in response to the NAL, and orders payment of the forfeiture within 30 days. As with any Commission order, the broadcaster may petition for reconsideration, *see, e.g., In the Matter of Liability of Sagittarius Broadcasting Corporation,* 7 F.C.C. Rcd 6873 (Oct. 23, 1992), *recon. denied,* 8 F.C.C. Rcd 3600 (May 20, 1993), *recon. denied,* 8 F.C.C. Rcd 7975 (Nov. 10, 1993), but it may not obtain judicial review at that stage. *Pleasant Broadcasting Co. v. FCC,* 564 F.2d 496 (D.C.Cir.1977). If the order becomes final and the broadcaster does not pay the forfeiture, the Commission issues progressively stiffer dunning letters, and threatens to refer and after 165 days does indeed refer the matter to the Department of Justice "for commencement of [a] civil action ... to recover the forfeiture," in accordance with 47 U.S.C. § 504(a). In defending that suit the broadcaster is entitled to a trial de novo on the question whether its broadcast was indecent. *Id.*

At the time the complaint in this case was filed, there were only three cases in which a broadcaster had held out long enough for the Commission to refer the matter to Justice, and the Department had actually filed only one case in district court. That case was settled after the court denied defense motions for partial judgment on the pleadings and for summary judgment. *See United States v. Evergreen Media Corp.,* 832 F.Supp. 1179 and 1183 (N.D.Ill.1993). Thus, as far as we can discern, no broadcaster has yet gone to trial on the merits of an FCC indecency determination, as envisioned by the statute; every one has either paid the forfeiture imposed or is awaiting action by the Commission or the Department of Justice.

Although the issue has never been litigated, we assume that the general five-year period of limitations on forfeiture proceedings, *see* 28 U.S.C. § 2462, would effectively prevent the Government from filing a civil action more than five years after the indecent material was aired. Once an action is timely filed, however, there is no law limiting the amount of time that may pass before the case is actually tried. In an extreme case, therefore, a broadcaster could wait as long as six or seven years from the time a program was aired until its first opportunity for judicial review of the Commission's decision that the material was indecent.

By all indications, a long wait promises to be the rule rather than the exception. The single forfeiture suit pending in district court as of March 1993 was filed two days before the five-year statute of limitations would have run, and was apparently close to disposition a little more than a year later. *Evergreen Media,* 832 F.Supp. 1179 and 1183. Based upon the shortest times reflected in the record, the earliest a broadcaster could hope to be brought into court is some two years after the offending broadcast.

This delay is unfortunate enough, but a number of other factors serve to exacerbate the effects of uncertainty about the outcome. First, a broadcaster claiming that a forfeiture is unconstitutional runs the risk of incurring an increased forfeiture for any subsequent indecency violation, *see, e.g., Letter to Mr. Mel Karmazin, President, Sagittarius Broadcasting Corporation,* 8 F.C.C. Rcd 2688, 2689 & n. 3 (December 18, 1992) (giving notice of intent to impose $600,000 forfeiture

in light of "apparent pattern of indecent broadcasting"), and the possibility· that the Commission will invoke the ultimate sanction, revocation of the broadcaster's license. *See* 47 U.S.C. §§ 307–309. Second, individual Commissioners have taken an active public role in criticizing broadcasters for airing indecent material and have let it be known that sanctions for such activity are likely to increase. Furthermore, the Commission will not, as a matter of policy, issue a declaratory ruling on whether a proposed broadcast is indecent. Thus, the only official guidance about the Commission's standards of decency available to a broadcaster is what can be gleaned from published NALs and forfeiture orders.

Against this background, the parties to this case have stipulated that:

At a hearing, plaintiff broadcasters would testify that because of the delays of securing administrative and judicial determinations in indecency forfeiture proceedings, and uncertainties as to the permissible scope of FCC indecency regulation, they attempt to conform their conduct to the indecency standards articulated by the FCC and its Commissioners, whether or not they believe those standards are constitutional, especially because of the various sanctions to which broadcasters are potentially subject.

The FCC does not concede that this testimony would be credible, but in light of the district court's grant of summary judgment to the Commission we must accept the appellants' version of the facts.

### B. The Appellants' Claims

The appellants do not argue that the delay they face in getting a final decision under the Commission's procedures is in itself unconstitutional. Rather they claim that the delay allows the FCC to take action against them without affording them the procedural safeguards necessary to avoid any abridgment of their first amendment rights.

The appellants challenge the forfeiture scheme on both constitutional and statutory grounds. As to the former, they claim that by forcing broadcasters to comply with the Commission's unreviewed determinations of indecency the scheme operates as a system of "informal censorship" similar to the one held unconstitutional in *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). As to the latter, they argue that the Commission also forces broadcasters to comply with its (perhaps invalid) standards by taking unpaid and unreviewed forfeiture orders into account in assessing subsequent forfeitures, *see, e.g., Letter to Mr. Mel Karmazin, President, Sagittarius Broadcasting Corporation,* 8 F.C.C. Rcd 2688, 2689 & n. 3 (December 18, 1992) (giving notice of intent to impose forfeiture in light of "apparent pattern of indecent broadcasting"), in violation of the. anti-bootstrapping provision of the Act, 47 U.S.C. § 504(c). That section provides:

In any case where the Commission issues a [NAL] looking toward the imposition of a forfeiture under this chapter, that fact shall not be used, in any other proceeding before the Commission, to the prejudice of the person to whom such notice was issued, unless (i) the forfeiture has been paid, or (ii) a court of competent jurisdiction has ordered payment of such forfeiture, and such order has become final.

Faced with these same claims and on cross-motions for summary judgment, the district court held that: (1) it had subject-matter jurisdiction over the appellants' facial challenge to the· constitutionality of the forfeiture scheme; but (2) owing to the primary jurisdiction of the Commission, the court did not have jurisdiction over the appellants' bootstrapping claim based upon 47 U.S.C. § 504(c); (3) the plaintiffs representing listeners and viewers do not have standing to challenge the forfeiture scheme; (4) the broadcaster plaintiffs that had never been subject to a forfeiture order do not· have standing to challenge the scheme; (5) as for the three broadcaster plaintiffs that had received NALs, the claims of the one that was then challenging the forfeiture in . another forum should be dismissed as a matter of comity, and the claims of a second were not ripe as no forfeiture had yet been imposed, but the claims of the third were reviewable; and, finally, (6) the enforcement scheme. is not unconstitutional. *Action for Children's*

*Television v. FCC,* 827 F.Supp. 4 (D.D.C. 1993).

## II. Jurisdiction

All of the issues raised in this appeal are matters of law, which we review de novo. We affirm the judgment of the district court because we come independently to the same conclusions.

### A. The Constitutional Claim

■ Although none of the parties now questions the district court's jurisdiction over the plaintiffs' constitutional claim, we have an independent obligation to consider the matter, for our own jurisdiction depends upon it. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990). Because a facial challenge to the constitutionality of a federal statute raises a federal question, the district court would ordinarily have jurisdiction under 28 U.S.C. § 1331. When an agency is involved, however, the issue is more complicated.

In *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70, 72 (D.C.Cir. 1984) *(TRAC),* we held that "where a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of review." In this case the district court rejected the Commission's argument that *TRAC* ousts it of jurisdiction, holding that there is a general exception to *TRAC* for constitutional claims. 827 F.Supp. at 10 n.6. We have encountered the question of such an exemption before, but we have not had to resolve it. *See Ticor Title Insurance Co. v. FTC,* 814 F.2d 731, 743 (D.C.Cir.1987) (opinion of Edwards, J.); *id.* at 757 (opinion of Green, J.); *Ukiah Adventist Hospital v. FTC,* 981 F.2d 543, 550–51 (D.C.Cir.1992). Nor need we do so today.

The district court was authorized to decide this case without need for an exception to *TRAC* because it is the district court that would have original jurisdiction over an FCC forfeiture proceeding. In other words, the district court's jurisdiction over the plaintiffs' challenge to the constitutionality of the forfeiture statute is no threat to the jurisdiction of the court of appeals because review of a Commission order imposing a forfeiture (in the defense against a collection suit) would itself be in the district court, not in the court of appeals.

### B. The Statutory Claim

■ In the absence of a definitive ruling by the Commission, the district court properly declined to address the plaintiffs' claim that the Commission's administration of the forfeiture scheme violates 47 U.S.C. § 504(c) because it takes previous incidents of alleged indecency into account when assessing a forfeiture. The Congress has given the district court jurisdiction to review a Commission decision imposing a forfeiture decision only in the course of a suit brought by the United States to collect the forfeiture. 47 U.S.C. § 504(a). Well-established principles of administrative law, moreover, dictate that the courts allow the agency to interpret the law before they determine whether the agency has violated it. *See McCarthy v. Madigan,* 503 U.S. 140, 144–47, 112 S.Ct. 1081, 1086–87, 117 L.Ed.2d 291 (1992) (recounting reasons for requiring exhaustion of agency remedies prior to judicial review).

The parties and the district court addressed the question of the district court's jurisdiction solely as the reciprocal of the Commission's primary jurisdiction; they would have been more appropriately concerned with the plaintiffs' failure to exhaust their administrative remedies. *See generally Reiter v. Cooper,* — U.S. —, —, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993) (discussing this distinction). Although it is true that the Commission did not have a prior opportunity to apply its expertise to the interpretation of the statute in the light of the plaintiffs' objections, a concern addressed by the doctrine of primary jurisdiction, that is only because the plaintiffs were trying to shortcut the administrative process—an effort barred by the requirement that they first exhaust their administrative remedies. *See id.*

■ As the Supreme Court pointed out in *United States v. Western Pacific Railroad*

*Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956):

"Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction" ... applies when a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.

While the present claim raises a question of first impression for the Commission, as is often the case as well where the doctrine of primary jurisdiction applies, *see, e.g., Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), that does not remove it from the ambit of the exhaustion requirement; indeed, the novelty of the question of statutory interpretation is an additional reason that the court should allow the administrative process to run its course before taking the matter into its own hands.

Regardless of the label employed, however, the substance of the matter is clear: it would be premature for a court to interpret the statute in a void, i.e., without the agency itself—as opposed to the lawyers defending the agency in court—having done so first. In this case there is not even an allegation before the court that the agency violated the statute in any particular case. The closest the plaintiffs come is the stipulation that "[i]n determining whether to increase the amount of a forfeiture because of a pattern of indecent broadcasting, the FCC has twice cited prior alleged indecent broadcasts that are the subject of contested and judicially unreviewed indecency forfeitures." *See Letter to Mr. Mel Karmazin, President, Sagittarius Broadcasting Corporation,* 8 F.C.C. Rcd 2688, 2689 & n. 3 (December 18, 1992); *Letter to Evergreen Media Corp.,* 8 F.C.C. Rcd 1266, 1267 & n. 5 (February 25, 1993). So far as we are informed, however, in neither of those cases had the Commission imposed an increased forfeiture upon the basis of the prior allegations. The district court in this case was in no position even to consider the propriety of the forfeitures in those cases: the amount of each contemplated forfeiture was clearly within the limit authorized by the statute, and the agency had yet actually to impose it.

The broadcasters involved in any pending forfeiture cases are, of course, free to make their own § 504(c) arguments before the agency (and again before the district court if necessary). The Commission itself may then adopt or not, as it thinks best, agency counsel's current litigation position, and we presume it will also then provide an explanation for its policy choice.

In a strikingly similar situation, Judge Sneed once wisely observed:

The position of the FCC in this lawsuit is clear enough. . . . It is not known, however, what the position of the FCC would have been, or in the future will be, when confronted by the plaintiffs' claim in a proper administrative proceeding. . . . Children shortly after leaving the cradle understand the difference between being forced to defend against a charge of naughtiness and being asked to consider whether they thought they had been nice. In the latter posture their response is much more likely to be open and forthcoming. Human psychology does not change too much between the cradle and the grave.

*Writers Guild of America West, Inc. v. American Broadcasting Co., Inc.,* 609 F.2d 355, 364 (9th Cir.1979) (involving a similar confluence of concerns about exhaustion and primary jurisdiction). We agree. Therefore we affirm the district court's dismissal of the plaintiffs' statutory claim.

C. Standing and Ripeness

The district court concluded that only one of the plaintiffs, Infinity Broadcasting, has both standing and a constitutional claim ripe for adjudication. 827 F.Supp. at 12–16. The Commission concedes Infinity's standing but argues that its claim is not ripe.

We agree with the district court and the parties that Infinity has standing. The Commission imposed a $6,000 forfeiture against Infinity in October 1992. *See In the*

*Matter of Liability of Sagittarius Broadcasting Corporation,* 7 F.C.C. Rcd 6873 (Oct. 23, 1992), *recon. denied,* 8 F.C.C. Rcd 3600 (May 20, 1993), *recon. denied,* 8 F.C.C. Rcd 7975 (Nov. 10, 1993). Keeping in mind that "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint," *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 264, 111 S.Ct. 2298, 2306, 115 L.Ed.2d 236 (1991), we accept Infinity's allegation that it is suffering collateral effects of that forfeiture determination—arguably in violation of the first amendment. Specifically, Infinity alleges that it is "chilled" from broadcasting protected speech for fear that the Commission will impose upon it a new forfeiture and will increase the amount of the penalty on the ground that Infinity has violated the indecency ban before. In view of the substance of Infinity's complaint—that the forfeiture scheme operates as a scheme of informal censorship—we conclude that Infinity meets the requirements of Article III, i.e., that it is suffering a concrete injury traceable to the challenged conduct and likely to be redressed by a favorable decision. *See Freedom Republicans, Inc. v. FEC,* 13 F.3d 412, 415 (D.C.Cir.1994) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). *See also Bantam Books,* 372 U.S. at 64 n. 6, 83 S.Ct. at 636 n. 6 (discussing publisher's standing to challenge regulation by standards of which commission suspected its books were illegal).

 The Commission argues that Infinity's claim is not ripe for adjudication because the broadcaster does not allege sufficient hardship to justify judicial interference with an on-going agency proceeding. The FCC also points out that at the time Infinity filed the complaint in this case the company was still seeking Commission reconsideration of the forfeiture order, further undermining its claim that the court should hear its complaint outside of the ordinary process for review of a forfeiture order.

 Ripeness turns upon two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Infinity's claim is a legal one, abstracted from the particular facts of any forfeiture. There is no dispute about the working of the procedures being challenged and there is therefore little or nothing more that the agency could do in a particular adjudication that would likely inform the court's decision on the question whether the enforcement scheme is currently being, or is capable of being, administered in accordance with the first amendment.

 Under the law of this circuit, once we have determined that an issue is clearly fit for review, there is no need to consider "the hardship to the parties of withholding court consideration," *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515, because there would be no advantage to be had from delaying review. *See Great Lakes Transmission Limited Partnership v. FERC,* 984 F.2d 426, 431 & n. 9 (D.C.Cir. 1993). Denying immediate review would be particularly ironic in this case: if Infinity has a valid claim, delay would only exacerbate the very wrong of which it complains. A collateral claim that certain procedures are unconstitutional because they unduly postpone judicial review is ripe when the claimant is adversely affected by those procedures. Under the Commission's suggested approach—that Infinity wait until the United States institutes a collection proceeding in the district court before challenging the procedures that put it there—the broadcaster would have to wait until judicial review is at hand before it could argue that judicial review does not come soon enough.

 Tellingly, the Commission does not argue that this dispute would look any different, be more ripe if you will, were we to put off review until another day. As the Supreme Court has said:

The ultimate test of reviewability is not to be found in an overrefined technique, but in the need of the review to protect from the irreparable injury threatened in the exceptional case by administrative rulings which attach legal consequences to action

taken in advance of other hearings and adjudications that may follow, the results of which the regulations purport to control. *Columbia Broadcasting System v. United States,* 316 U.S. 407, 425, 62 S.Ct. 1194, 1204, 86 L.Ed. 1563 (1942). Though we ultimately conclude that the FCC is not operating a scheme of informal censorship like the one held unconstitutional in *Bantam Books,* the possibility that the agency's actions might similarly run afoul of the first amendment demands prompt judicial scrutiny.

### III. The Merits

At oral argument in this court, counsel for the appellants made it clear that they are challenging the scheme for enforcing forfeitures (for indecent broadcasts only) both on its face and as applied. Because of the very general nature of the statutory provisions at issue, and because there is no individual forfeiture case before the court, we are in no position to assess the application of the Commission's procedures to any specific case. On the other hand, the Commission has stipulated that its practices in applying the forfeiture scheme in indecency cases are as described in the record. We are being asked, therefore, to evaluate a process that is more fleshed-out than those courts often see in cases raising a facial challenge to a statutory scheme that is not highly specified. *See, e.g., Keystone Bituminous Coal Ass'n v. De-Benedictis,* 480 U.S. 470, 495, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987).

Accordingly, we shall take the appellants at their word and answer two questions: (1) Are the statutes that prescribe the procedures by which the Commission may impose a forfeiture for the broadcast of indecent material capable of constitutional application? and (2) If so, then does the record show that the Commission is applying the statutes in a constitutional manner?

### A. The Facial Challenge

▇ The Supreme Court has repeatedly emphasized that:

A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances

exists under which the [Act] would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid.

*Rust v. Sullivan,* 500 U.S. 173, 183, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991) (quoting with changes *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)). With this teaching in mind, we readily reject the appellants' claim insofar as they are arguing that the statutory enforcement scheme is incapable of constitutional application with regard to indecency violations. Prompt and efficient enforcement by the Commission could surely expedite the administrative process to an extent that leaves ample breathing space for first amendment rights.

Certainly nothing in the statutes or regulations prevents the Commission from issuing a NAL, imposing a forfeiture, and if need be referring a case to the Department of Justice all within a period of time short enough virtually to eliminate any concern with delay. The whole course could probably be run in most cases within, say, 90 days. No case of this type is very complex; each turns simply upon whether a certain broadcast was indecent. Indeed, under the Commission's own internal guidelines, after a broadcaster has had 30 days to respond to the NAL, the target for imposing a forfeiture is only 60 more days. If the FCC met this goal and then allowed the broadcaster to stipulate that it will not pay unless ordered by a district court to do so, then judicial review could begin almost immediately. *Cf.* 47 C.F.R. § 1.822(b) (providing for expedited FCC hearing procedures); 29 C.F.R. § 101.17, *et seq.* (expedited bargaining-unit certification procedures under the NLRA); 49 U.S.C. § 10905 (expedited land-valuation procedures under the Interstate Commerce Act); 18 U.S.C. § 3161, *et seq.* (Speedy Trial Act). In practice, no case has moved through the pipeline that quickly, but we are aware of no reason why the Commission could not, in principle, act with such dispatch. Reducing delay would also cabin the Commission's opportunity to rely upon its own unreviewed forfeiture decisions in setting standards of

decency, thereby reducing the tendency for one unconstitutional decision to beget others.

In short, the FCC's indecency-enforcement scheme is clearly capable of constitutional application. Indeed, were the administration of this scheme merely expedited it would be indistinguishable, relative to the first amendment concern, from the undoubtedly constitutional process whereby the Government may bring a criminal action in district court for a violation of 18 U.S.C. § 1464.

### B. The challenge to the statutes as applied

 The more difficult question is whether the statutes as applied pass muster under the teaching *Bantam Books v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). We agree with the appellants that some of the Commission's procedures are troubling but, on the basis of the record before us, we cannot agree that those procedures violate the first amendment. The centerpiece of the appellants' grievance is that:

> [B]ecause of the delays of securing administrative and judicial determinations in indecency forfeiture proceedings, and uncertainties as to the permissible scope of FCC indecency regulation they attempt to conform their conduct to the indecency standards articulated by the FCC and its Commissioners, whether or not they believe those standards are constitutional.

That simply does not establish a violation of the Constitution.

In *Bantam Books,* Rhode Island had established a Commission to Encourage Morality in Youth and authorized it to determine whether publications were "objectionable for sale, distribution or display to youths." 372 U.S. at 61, 83 S.Ct. at 634. Upon an affirmative finding, the Morality Commission would send a letter urging the distributor of the offending material not to carry the publication, and would refer the matter to the local police for investigation and possible prosecution under the state obscenity law. *Id.* at 62, 83 S.Ct. at 635. The Supreme Court struck down this scheme because it "amount[s] to ... governmental censorship devoid of the constitutionally required safeguards for state regulation of obscenity, and thus abridge[s]

First Amendment liberties." *Id.* at 64, 83 S.Ct. at 636.

 The lesson of *Bantam Books* is that the state may not move to suppress speech by means of a scheme that, as a practical matter, forecloses the speaker from obtaining a judicial determination of whether the targeted speech is unprotected, lest the state be able effectively to suppress protected speech. In that case it was established, as a matter of fact, that a notice from the Commission would cause the distributor to cease selling the listed publications without a judicial determination of whether the material was legally subject to proscription. *Id.* at 62–64, 83 S.Ct. at 635–36. Thus, the Court concluded, "What Rhode Island has done, in fact, has been to subject the distribution of publications to a system of prior administrative restraints, since the Commission is not a judicial body and its decisions to list particular publications as objectionable do not follow judicial determinations that such publications may lawfully be banned." *Id.* at 70, 83 S.Ct. at 639.

The appellants argue that the FCC has similarly implemented a system of "prior administrative restraint" that, for want of appropriate procedural safeguards, forces protected and unprotected material alike off the air. *See, e.g., Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (striking down motion-picture censorship scheme for lack of such safeguards). Unlike the state in *Freedman,* however, the Commission is not administering anything akin to a literal prior restraint. Broadcasters are free to air what they want; if and only if what they air turns out to transgress established guidelines do they face a penalty—but that is very much after the fact, not prior thereto. The Commission's ability to penalize a broadcaster in this manner was upheld by the Supreme Court in *Pacifica,* where the Court specifically rejected the argument that the agency's enforcement of the ban on indecency violates the statutory prohibition of censorship by the Commission. *See* 438 U.S. at 735–38, 98 S.Ct. at 3033–35.

 As the Court recognized in *Bantam Books,* however, a scheme may also be a

prior restraint in effect even though specific materials are not evaluated prior to publication (or here broadcast) if that scheme in practice causes a speaker of reasonable fortitude to censor itself in order to conform with an unconstitutional standard. This case therefore turns upon the question whether the regime that leads broadcasters to "attempt to conform their conduct to [FCC] indecency standards" is analogous to the scheme that forced booksellers in Rhode Island to drop publications officially declared "objectionable" for fear of a possible prosecution for selling obscene materials.

We cannot help but conclude that the appellants have failed to establish any essential similarity between this case and *Bantam Books.* Unlike the Rhode Island Commission, which sought to regulate materials that could not be proscribed as obscene, 372 U.S. at 62 n. 4, 83 S.Ct. at 635 n. 4, so far as this record shows the FCC is not enforcing the statutory ban on indecency against material that is not indecent. Again unlike the Rhode Island Commission, which could and did avoid judicial oversight because the mere threat of prosecution coerced booksellers into complying with its recommendations, *id.* at 62 n. 5, 83 S.Ct. at 635 n. 5, we have no indication that the FCC has done anything actively to discourage judicial review of any indecency forfeiture it imposed. That no case has yet progressed to judicial review may be the effect of any of several inoffensive causes: the Commission has only recently stepped up its enforcement efforts; the violators penalized thus far may very well have broadcast the indecency as charged and thus seen no point in contesting the forfeiture in court; and broadcasters may be self-censoring only indecent material, eliminating the need for many prosecutions. Indeed, some degree of self-censorship is inevitable and not necessarily undesirable so long as proper standards are available. *See Pacifica*, 438 U.S. at 743, 98 S.Ct. at 3037 ("At most [self-censorship] will deter only the broadcasting of patently offensive references to excretory and sexual organs and activities. While some of the references may be protected, they surely lie at the periphery of First Amendment concern").

Finally, there is no indication that the FCC—unlike Rhode Island's free-roving Commission to Encourage Morality in Youth, 372 U.S. at 70, 83 S.Ct. at 639—has failed or will fail to follow judicial guidelines for determining what is indecent and what is not, as they have developed and will develop in judicial decisions. The suggestion that every determination of indecency must be a judicial one simply proves too much; the Commission could then play no role in developing or enforcing the Congress's declared policy of banning indecency from the air-waves during certain hours of the day. We have no indication that the Commission is developing a body of precedent in any way at odds with the first amendment, or that the agency would continue to do so in the face of a corrective court decision. While the prospect of a forfeiture trial may understandably cause some broadcasters to forego judicial review of a Commission determination that a program was indecent, we find no indication in this record that the FCC is taking the opportunity afforded thereby to impose unconstitutional restrictions upon broadcast speech.

Under the statute as administered, a broadcaster need do nothing at all until it is served with a complaint, at which point it is entitled to a trial de novo in district court. Nothing but the timing would be different if the Congress were to change the current scheme so as to allow the Commission to bring a forfeiture action in district court immediately after the airing of an allegedly indecent broadcast, which would be unquestionably constitutional. The distinction, i.e., the delay inherent in the current scheme, is of constitutional significance only if it burdens broadcast speech that is not indecent. The parties have stipulated that some speech is being burdened in that broadcasters "conform their conduct to the indecency standards articulated by the FCC ... whether or not they believe those standards are unconstitutional." The broadcasters would go one step farther and argue that the delay thereby chills protected as well as indecent speech;

however, they have failed to make any such showing.*

Alternatively, the broadcasters' claim might be more compelling if in a particular case the Commission increased the fine for a subsequent violation or decided not to renew a license when the broadcaster had neither acquiesced in the former determination of indecency nor yet had its day in court. Such a situation creates a greater risk that material that is not indecent is being kept off the air. Even that, however, would still be the stuff upon which an individual, not a generic, challenge to enforcement would be built.

Several additional factors might also serve to distinguish the scheme administered by the Commission from the one struck down in *Bantam Books*. As the district court noted: (1) that case concerned the printed word, which, unlike broadcasting, has historically enjoyed the broadest protection under the first amendment; (2) the FCC, unlike the Rhode Island Commission, gives a putative violator notice and an opportunity to respond to the charge against it; (3) the decisions of the FCC are subject to judicial review; and (4) the broadcaster that would avoid a dispute with the FCC need only move its arguably indecent material to a different time of day, not refrain from broadcasting it altogether. In light of the appellants' failure to show that speech that is not indecent is in fact being chilled, however, we need not decide whether these differences actually serve to distinguish the two regimes. Still, they are points of difference, and they serve to underscore the bottom line: The allegation that the FCC is chilling protected speech by means of the forfeiture scheme is not nearly as compelling as was the corresponding claim in *Bantam Books*. There is no indication in the case law that such a scheme is unconstitutional absent some showing that the agency is forcing off the air material that is not indecent.

---

* Our dissenting colleague points out (at 1) that no one can "show that non-indecent speech is unaffected by the forfeiture scheme, since an impartial, independent Article III court has never evaluated any of the Commission's indecency decisions"; the plaintiffs in this case, however, have failed to allege that non-indecent speech is being affected. While the Government does have "the burden of instituting judicial proceedings, and of

## IV. Conclusion

Although the appellants have failed to show that the Commission's administration of the statute is unconstitutional, we cannot fail to acknowledge that the agency's practices could give rise to some of the evils that the appellants claim are already at hand. Two avenues of relief are available, however, to any broadcaster that in fact comes to the grief alleged in this case. First, the broadcaster could stipulate the facts giving rise to the Notice of Apparent Liability and state that it will not pay the forfeiture unless ordered to do so in district court; the Commission could then forward the matter to the Department of Justice immediately, so that the broadcaster could get a trial on the merits of the forfeiture relatively quickly.

Alternatively, if the Commission will not cooperate in order to expedite judicial review as outlined above, then as we noted in *Pleasant Broadcasting*, 564 F.2d at 502, a broadcaster "suffering from demonstrably adverse consequences from government delay in initiating the collection proceeding ... could bring a declaratory judgment action against the United States in the district court." A broadcaster that refrains from airing material that is not indecent because of a legitimate fear, based upon the Commission's prior indecency cases, that it would be subject to a forfeiture should in this way be able promptly to dispel any unwarranted chilling effect. Its claim would seem to be ripe for review if it is suffering a current injury that could be remedied by a judicial determination that the material is not indecent. In short, a broadcaster is free to prove up, in a specific case, the general claim that we adjudge deficient today.

For the reasons stated in Parts II and III above, the judgment of the district court is

*Affirmed.*

---

proving that thee material is unprotected" (dissent at 1266–67) when it seeks to impose liability for an indecent broadcast, the broadcasters brought this case and they had the burden of alleging a set of facts that would, if proved, entitle them to the relief they seek. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

HARRY T. EDWARDS, Chief Judge, concurring with reservations:

After grappling in recent months with several cases involving the application of the First Amendment in the context of Government regulation of "indecent" speech in the broadcast media, *see, e.g., Action for Children's Tel. v. FCC,* 11 F.3d 170, 183–86 (D.C.Cir.1993) (Edwards, J., concurring); *Alliance for Community Media v. FCC,* 56 F.3d 105, 110–11 (D.C.Cir.1995) *(en banc)* (Edwards, C.J., dissenting in part); *Action for Children's Tel. v. FCC,* 58 F.3d 654, 670–83 (D.C.Cir.1995) *(en banc)* *("ACT III")* (Edwards, C.J., dissenting), I have come to the conclusion that the law is in a state of disarray. Application of the First Amendment in this context seems to border on whimsical, for as often as not there is little coherence in the case law. For example, I have yet to comprehend the distinction that is drawn between *broadcast* and *cable* television, with broadcast stations having reduced First Amendment rights even though cable is concededly much more responsible for the showing of indecent programming. This is but a tip of the iceberg, so I will not dwell on my incredulity.

I join the majority opinion, because, absent any aspirational gloss, I believe that it is essentially correct in stating and applying extant law. This is not to say that the extant law makes any sense when considered carefully, but that is a matter beyond my authority.

My concurrence comes with a caveat, however. Not surprisingly, the majority opinion is underscored by several references to *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). However, insofar as *Pacifica* commands a distinction in the treatment of broadcast and cable media in the application of the First Amendment, I think that it has no place in our constitutional jurisprudence. *See ACT III,* 58 F.3d at 672–77 (Edwards, C.J., dissenting). Indeed, although the Supreme Court declined to revisit *Pacifica* in its recent decision in *Turner Broadcasting System, Inc. v. FCC,* —— U.S. ——, ——–——, 114 S.Ct. 2445, 2456–57, 129 L.Ed.2d 497 (1994), I do not understand how the two opinions can

stand together. Although I reject *Pacifica,* I do not doubt that the Government can regulate "indecent" speech, so long as "the Government's interests [are] 'compelling,' and the method of regulation chosen [is] 'the least restrictive means' to achieve those compelling interests." *ACT III,* 58 F.3d at 677 (Edwards, C.J., dissenting) (quoting *Sable Communications, Inc. v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836–37, 106 L.Ed.2d 93 (1989)). Under this standard, I believe that, in order to justify the regulation of indecency, the Government must show that the "harms" it seeks to prevent " 'are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.' " *Id.,* 58 F.3d at 680 (quoting *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2470). There is no showing of harm in this case, so I remain doubtful about the constitutionality of sections 503(b) and 504(a) of the Communications Act, 47 U.S.C. §§ 503(b), 504(a) (1988).

At bottom, there are two reasons why the concerns that I expressed in *ACT III* do not carry the day for me here. First, the principal claim of the appellants in this case is that the FCC's delay in enforcing the statute allows the agency to take action against them without affording them the *procedural safeguards* necessary to avoid any abridgement of their First Amendment rights. This position implicitly assumes that the regulation itself is constitutionally permissible, so the points that I addressed in *ACT III* do not come into play in this case. Second, in *ACT III,* a majority of the *en banc* court indulged a presumption that exposure to indecent speech always is harmful to minors. I disagree with this finding, for, in my view, it rests on a baseless proposition. Nonetheless, *ACT III* is the law of the circuit, so I am bound by the court's holding in that decision.

I agree with the majority opinion that there are some serious problems with the current practice followed by the FCC in administering sections 503(b) and 504(a), and that "the agency's practices could give rise to some of the evils that the appellants claim are already in hand." Appellants cannot prevail in this case, however, because they have failed to show that speech that is not inde-

cent is in fact being chilled. If such a claim is supported in the future, the parties will face a different result.

I conclude with an innocent hope that the Supreme Court will one day soon lend some clarity to these areas of First Amendment jurisprudence. And with that hope, I concur.

TATEL, Circuit Judge, dissenting:

Because "the line between speech unconditionally guaranteed and speech which may legitimately be regulated ... is finely drawn," the Supreme Court requires the use of "sensitive tools," including prompt judicial review, to draw that line. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66, 70, 83 S.Ct. 631, 637, 639, 9 L.Ed.2d 584 (1963) (internal quotation marks and citations omitted). As the Court has said, "only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression." *Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965). The Federal Communications Commission certainly could implement its indecency forfeitures under section 503(b)(4) in a constitutional manner by allowing "judicial review [to] begin almost immediately." Majority opinion (Maj.Op.) at 1259. But it does not. The stipulated record in this case demonstrates that the Commission's actual implementation of the statute is characterized by years of delay and a total lack of judicial review: of the thirty-six FCC indecency forfeiture orders issued since 1987, not one has been reviewed by a court; and individual indecency forfeiture orders take from two to seven years to get to court, if they get there at all. Stipulations of Fact ¶¶ 19, 21, *in* Joint Appendix (J.A.) at 46, 47 & 95–102.

The court nonetheless rejects appellants' challenge to the FCC's indecency forfeiture enforcement scheme, explaining that because the broadcasters have not proven the chilling of non-indecent speech, they have failed to demonstrate the requisite harm. *See* Maj. Op. at 1261–62. With all due respect, it is not clear to me how anyone could show that non-indecent speech is unaffected by the forfeiture scheme, since an impartial, independent Article III court has never evaluated any of the Commission's indecency decisions.

To me, however, the constitutional infirmity of the FCC forfeiture enforcement scheme turns not on whether the broadcasters have explicitly alleged the chilling of non-indecent speech—although I think such an allegation is inherent in their First Amendment challenge to this scheme—but on the fact that it exhibits the same basic procedural inadequacies as the censorship scheme that the Supreme Court found unconstitutional in *Bantam Books*.

In *Bantam Books*, Rhode Island's "Commission to Encourage Morality in Youth" was responsible for identifying publications with "obscene, indecent or impure language." *Id.* at 59–60, 83 S.Ct. at 633. The Commission wrote letters to distributors informing them of certain "objectionable" publications within their inventory and reminding them of the Commission's duty to report violations of the obscenity laws to the Attorney General for prosecution. *Id.* at 61–62, 83 S.Ct. at 634–35. The trial court found that distributors receiving such letters discontinued the sale of the objectionable materials. *Id.* at 63, 83 S.Ct. at 635. According to the Supreme Court, the Rhode Island Commission operated a system of "informal censorship" of books and publications that it found obscene or otherwise objectionable by means of "informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Id.* at 67, 83 S.Ct. at 637. The Court invalidated the Commission's "radically deficient" procedures, finding that they provided no "judicial superintendence before notices issue or even for judicial review of the Commission's determinations of objectionableness." *Id.* at 71, 83 S.Ct. at 640.

Like the Rhode Island Commission to Encourage Morality in Youth, the FCC censors speech, buttressing its informal powers through coercion and intimidation. The Rhode Island Commission warned that it would refer violators to the Attorney General, *id.* at 62–63, 83 S.Ct. at 635–36; the FCC threatens to increase fines, revoke licenses, and prevent acquisition of additional stations, *see* Stipulations of Fact ¶¶ 26–27, *in* J.A. at 48–49. While judicial review is possible in both schemes—a criminal obscenity prosecu-

tion in *Bantam Books* and civil enforcement of FCC forfeiture orders here—in neither case are the parties practically able to obtain judicial review within any reasonable time frame.

It is true that the FCC's indecency forfeiture scheme involves a different medium of communication than the one in *Bantam Books* and that it includes a late-night safe-harbor period during which the "arguably indecent material" may be broadcast. Maj. Op. at 1261–62. These differences, however, have no bearing on the fundamental procedural flaw in the FCC's indecency forfeiture scheme. Like the "system of prior administrative restraints" invalidated in *Bantam Books*, 372 U.S. at 70, 83 S.Ct. at 639, the FCC is an administrative agency charged with evaluating the decency of broadcasts and operating, in practice, without judicial review. "Because the censor's business is to censor," the Supreme Court has consistently warned that administrative agencies "may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." *Freedman,* 380 U.S. at 57–58, 85 S.Ct. at 738–39; *see Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 560–61, 95 S.Ct. 1239, 1247–48, 43 L.Ed.2d 448 (1975); *see also* Henry P. Monaghan, *First Amendment "Due Process,"* 83 Harv. L.Rev. 518, 523 (1970) (agencies tend to have a "narrow and restricted viewpoint" that is "particularly pernicious in the obscenity area" because "those constantly exposed to the perverse and the aberrational in literature are quick to find obscenity in all they see."). When administrators have "unbridled discretion" to suppress speech, prompt review is all the more critical to minimize "the danger of censorship and of abridgment of our precious First Amendment freedoms." *Conrad,* 420 U.S. at 553, 560, 95 S.Ct. at 1244, 1247.

In my view, moreover, the FCC's indecency forfeiture scheme poses a greater threat to free expression than the system the Supreme Court struck down in *Bantam Books.* For one thing, the FCC's forfeiture scheme regulates indecent speech, which is protected by the First Amendment, whereas in *Ban-*

*tam Books* the Supreme Court addressed the regulation of obscenity, which is not constitutionally protected. Because a "dim and uncertain line" separated obscenity from constitutionally protected speech, *Bantam Books* held that "sensitive tools" were needed to separate protected from unprotected speech. *Bantam Books,* 372 U.S. at 66, 83 S.Ct. at 637. Such tools are even more critical where, as here, constitutionally protected speech lies on both sides of an equally imprecise line.

Not only is judicial review unavailable, but the Commission relies on its unreviewed indecency determinations to impose increased penalties on broadcasters that air material the FCC has previously declared indecent. In several instances, the Commission has doubled and tripled forfeitures, explaining that past violations "establish a pattern of apparent misconduct warranting the fine we set today," *Letter to the Rusk Corp.,* 8 F.C.C. Rcd 3228, 3229 n. 3 (1993); that "the violation was repeated, and … your past compliance history includes similar apparent misconduct," *Letter to Evergreen Media Corp.,* 8 F.C.C. Rcd 1266, 1267 (1993); and that the broadcast was "egregious," given the Commission's prior determination that the same material was indecent, *Letter to KGB Inc.,* 7 F.C.C. Rcd 3207, 3207 (1992). While individual Commissioners admonish broadcasters "to learn from the actions that are out there," Doug Halonen, *Marshall Defines Stance on Indecency,* Elec. Media, Jan. 15, 1990, at 136, *in* J.A. at 93, at the same time the Commission evaluates the decency of material on a "case-by-case" basis, frequently rejecting broadcasters' defense that the aired material was similar to material that the FCC had previously chosen not to sanction, *see, e.g., Liability of Sagittarius Broadcasting Corp.,* 7 F.C.C. Rcd 6873, 6874 (1992).

Finally, unlike the "free-roving" Commission in *Bantam Books* that had no regulatory control over the distributors it targeted, the FCC controls every aspect of a broadcaster's livelihood—indeed, its very existence. In addition to the obvious adverse economic impact of large fines, the parties stipulated that "the loss of a license would be catastrophic for any broadcaster, and that a credible

threat of a revocation proceeding can seriously impair a broadcaster's effort to raise capital." Stipulations of Fact ¶ 29, *in* J.A. at 49.

The Commission's treatment of Infinity Broadcasting Corporation demonstrates the leverage the agency has over broadcasters, as well as its use of unreviewed indecency determinations to impose stiff monetary penalties. The Commission notified Infinity and one of its subsidiaries that it intended to levy a $200,000 forfeiture on each of three stations that broadcast the same allegedly indecent program. *Letter to Mr. Mel Karmazin, President, Sagittarius Broadcasting Corp.*, 8 F.C.C. Rcd 2688, 2689 (1992). It based this unusually large fine on "the apparent pattern of indecent broadcasting exhibited by Infinity over a substantial period since our initial indecency warning." *Id.* The Commission warned that any future failures to comply with its indecency regulations would produce additional sanctions, including possible revocation of Infinity's broadcast licenses. *Id.* at 2690. Commissioner Quello made this threat explicit: "We could, for example, say 'enough is enough' and set all, or some, of Infinity's licenses for hearing to determine whether Infinity possesses the character to continue to hold them or whether they should be revoked. At this time—and I underline, *at this time*—I am not persuaded to take this step." *Id.* at 2691 (Quello, Comm'r, separate statement). Because of Infinity's alleged indecent programming, the Commission also seriously considered blocking its proposed acquisition of additional stations, but ultimately allowed the acquisition to go through at least in part, according to one Commissioner, because Infinity bowed to the Commission's threats and promised not to broadcast the program containing the allegedly indecent material on the newly acquired stations. *See Applications of Cook Inlet Radio License Partnership*, 8 F.C.C.Rcd 2714, 2721 (1992) (Quello, Comm'r, concurring). In a subsequent Notice of Apparent Liability to Infinity regarding material aired in a different segment of the same program, the Commission acknowledged the extent to which the licensee had caved in to Commission pressure, noting with approval Infinity's efforts to conform to the FCC's view of inde-

cency by rigorously reviewing and modifying programs, as well as by instituting a multiple "delay" mechanism and requiring management-level personnel to monitor continuously the programs as they aired. *Letter to Mr. Mal Karmazin, Infinity Broadcasting Corp.*, 8 F.C.C.Rcd 6740, 6741 (1993). But again, the Commission warned that "any future infractions [of the indecency regulations] would place Infinity's continuing fitness as a Commission licensee in question." *Id.*

That broadcasters "attempt to conform their conduct to the indecency standards articulated by the FCC and its Commissioners, whether or not they believe that those standards are constitutional," Stipulations of Fact ¶ 30, *in* J.A. at 50, is thus not surprising. As the Supreme Court recognized in *Bantam Books*, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." 372 U.S. at 68, 83 S.Ct. at 638. According to the record in this case, that is exactly what broadcasters are doing: they "come around" in the face of economic and regulatory coercion, not necessarily because their broadcasts are indecent, but because they cannot get judicial review of the Commission's indecency determinations. This manipulation of speech without judicial review is unconstitutional.

While I enthusiastically support the suggestion that the FCC and the Department of Justice speed things up, *see* Maj.Op. at 1262, I do not think this offers broadcasters much relief, since it completely depends on the willingness of two different agencies to expedite their actions. Nor am I reassured by the suggestion that broadcasters are "free to prove up" their claims in an action for a declaratory judgment, *id.* at 1262, because the broadcasters, rather than the government, would then bear the burden of obtaining judicial review as well as the burden of proof. "Where the transcendent value of speech is involved," *Freedman*, 380 U.S. at 58, 85 S.Ct. at 739 (quoting *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)), the government must bear "the burden of instituting judicial proceedings, and of proving that the material

is unprotected." *Conrad,* 420 U.S. at 560, 95 S.Ct. at 1247.

I would remand the case for the district court to establish procedures to facilitate prompt judicial review of forfeiture determinations. Properly designed, such procedures would not interfere with the Commission's implementation of its Congressional mandate to regulate indecency. Instead, they would ensure that the agency fulfill its responsibilities within constitutional boundaries.